IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 3:09CR133- REP |
| v. | ) | |
| | ) | |
| RODNEY LORENZO WYATT, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION OF UNITED STATES TO MOTION OF DEFENDANT
FOR COMPASSIONATE RELEASE**

On May 11, 2020, the defendant filed a Motion For Compassionate Release in this

Court, even though the defendant had previously appealed the Court's November 19, 2019 denial

of his First Step Act sentence reduction motion. That appeal is currently being briefed before the

Fourth Circuit. On May 21, 2020, the Court directed the United States respond to the motion

within 15 days of its filing which is May 26, 2020.[1] The United States opposes the motion.

**Table of Contents**

I. There is no jurisdiction to consider the motion in this Court at this time.

    A. The defendant bears the burden of establishing jurisdiction.

    B. Because the case is on appeal to the Fourth Circuit there is no jurisdiction in this
    Court to order release of the defendant.

    C. The defendant has not complied with the requirement for administrative exhaustion.

        1. Defendant is required to provide the BOP with a request for compassionate
        release because of COVID-19, and the BOP then has a mandatory 30-day period
        to evaluate the request.

---

[1] Crim.R. 45(a)(1). The Order also directs the U.S. Probation Office to file a position on the
motion within 15 days of the May 11, 2020 filing date. The United States has not had the
opportunity to review the Probation Office's response.

2. The 30-day exhaustion requirement in § 3582(c)(1)(A) is jurisdictional.

3. Exhaustion properly provides BOP with an opportunity to assess the claim.

4. The exhaustion requirement should not be waived.

5. The defendant has not complied with the administrative consideration notice requirement.

II. The motion is without merit.

A. Defendant's motion should be evaluated against a practical and legal backdrop.

B. The defendant cannot establish "Extraordinary and Compelling Reasons" to warrant a substantial sentence reduction.

C. The general reference to Covid-19 existence and the possibility of it getting into a prison population, is an inadequate basis for the relief sought.

D. The defendant has not met his burden to demonstrate medical conditions justifying release.

1. The defendant cannot establish a particular susceptibility of the defendant to Covid-19.

2. The defendant has not established he is seriously medically debilitated to an extraordinary and compelling level.

a. High Blood Pressure/hypertension.

b. Heart Disease.

c. Prostate cancer.

d. "High" cholesterol.

e. Diabetes.

f. Self-inflicted medical issues.

E. The defendant has not presented an adequate release plan.

F. The circumstances of the defendant's case, as fully presented in the prior denied First Step Act Motion outweigh the defendant's arguments now.

G.  Additional information as directed in the Court's response Order.

    1.  The Petitioner's currently-projected date of release.

    2.  Status of the Petitioner's educational and vocational training.

    3.  Status of any treatment for substance abuse or physical or mental health.

    4.  The Petitioner's post-sentencing conduct, including the Petitioner's compliance with the rules of the institution(s) in which the Petitioner has been incarcerated.

    5.  Any relevant considerations of public safety.

## Argument

## I.  There is no jurisdiction to consider the motion in this Court at this time.

### A.  The defendant bears the burden of establishing jurisdiction.

The defendant does not address in his filing the jurisdictional basis for his motion. But it is his burden to establish that this Court has jurisdiction to act on his motion.  "The burden of establishing that jurisdiction is proper 'rests upon the party asserting jurisdiction.'" *Kouambo v. Barr*, 943 F.3d 205, 209 (4th Cir. 2019) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)).

### B.  Because the case is on appeal to the Fourth Circuit there is no jurisdiction in this Court to order release of the defendant.

The courts have clearly held that a district court is divested of jurisdiction concerning a Compassionate Release Motion once the defendant has taken an appeal.  *See, United States v. Walls*, 2020 WL 1934963, at *2 (E.D. Mich. 2020)(defendant's pending appeal before the Sixth Circuit deprives this Court of jurisdiction to rule on the defendant's instant motion for compassionate release); *Sundblad*, 2020 WL 1686237, at *2  (citing, *United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *1-2 (3d Cir. Apr. 2, 2020)).

Filing a notice of appeal transfers adjudicatory authority from the district court to the court of appeals. Specifically, the filing "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (*per curiam*); *United States v. Carman*, 933 F.3d 614, 617 (6th Cir. 2019); *see also Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.,* 71 F.3d 1197, 1203 (6th Cir. 1995); *United States v. Holloway*, 740 F.2d 1373, 1382 (6th Cir. 1984).

This Court lacks jurisdiction over the defendant's present motion because the requested relief involves matters integrally related to the merits of the defendant's appeal. The same arguments being made here are also at issue in the appeal of the Court's denial of the prior First Step Act Sentence Reduction Motion. A pending appeal that involves a defendant's sentence deprives a district court of jurisdiction to rule on the defendant's motion for compassionate release. *United States v. Martin*, No. 18-CR-834-7, 2020 WL 1819961, at *1–*2 (S.D.N.Y. Apr. 10, 2020).

Indeed, the defendant's appeal seeks the same ultimate relief as his most recent First Step Act Motion: a substantial reduction of approximately 49% in his sentence. The presence of two pending proceedings on the same issue (the length of the defendant's sentence) risks inconsistent rulings from this Court and the Fourth Circuit on that issue. The orderly disposition of cases therefore requires waiting[2] for a ruling from the Fourth Circuit before this Court proceeds to rule

2 Of course, the Court has the option under Fed. R. Crim. P. 37(a)(3)) to deny the motion, issue an "indicative" advisory ruling, or hold that the motion raises a "substantial issue." Should the Court issue an indicative ruling, or rule that the motion raises a substantial issue, the defendant would then have to notify the Fourth Circuit Clerk, the Fourth Circuit would take such action as it deemed appropriate, and this Court would then be able to decide the issue *if* the Fourth Circuit remanded for that purpose. *See, United States v. Hammond*, 2020 WL 1891980, at *1 (D.D.C., 2020); *United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *1 (3d Cir. Apr. 2, 2020);

on any motion seeking to modify the defendant's sentence. The Court should not take any action

that could alter the status of the case as it rests before the Court of Appeals. *United States v.*

*Gallion*, 534 F. App'x 303, 310 (6th Cir. 2013); *Dayton Indep. School Dist. v. U.S. Mineral*

*Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir. 1990); *Walls*, 2020 WL 1934963, at *2.

Given this record, while the appeal is pending, the Court lacks jurisdiction to consider the

defendant's motion for compassionate release. The Court should therefore deny the motion.

**C.  The defendant has not complied with the requirement for administrative exhaustion.**

**1.  The defendant is required to provide the BOP with a request for compassionate release because of COVID-19, and the BOP then has a mandatory 30-day period to evaluate the request.**

The Court should also reject the defendant's filing as an attempted end run around the

administrative requirement seeking Court consideration of the same medical issues in this

procedural setting.  A defendant must make a request for compassionate release based on Covid-

19 with the BOP which is a prerequisite to consideration of his Covid-19 arguments presented

here.

Under § 3582(c)(1)(A), a defendant cannot obtain relief from this Court until the BOP is

given 30 days to evaluate the defendant's motion for compassionate release based on the threat

of COVID-19.  The Third Circuit recently confirmed that where 30 days have not passed

---

*Sundblad*, 2020 WL 1686237, at *2.  Even still, remand is by no means a foregone conclusion. See, eg., *Raia*, No. 20-1033, 2020 WL 1647922, at *1.

But here the defendant is not requesting an indicative ruling or determination of substantial issue.  Rather, not in compliance with Rule 37, the defendant is demanding an immediate release order.  If the defendant wants to file an amended motion changing the relief sought, the defendant may with leave of the Court do so.  But for now, the defendant's posture of pursuing an appeal of the First Step Act Motion denial, while also submitting essentially the same issues and relief sought in this motion to this Court, and is therefore procedurally fatally flawed.

following presentation of a request to a warden, the statute "presents a ***glaring roadblock*** foreclosing compassionate release at this point." *United States v. Raia*, __F.3d__, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020)(emphasis added). *See also, United States v. Darcy*, 2020 WL 2573251, at *3 (W.D.N.C., 2020)(conditions does not render the exhaustion of administrative remedies futile); *Feiling*, 2020 WL 1821457, at *4; *Sundblad*, 2020 WL 1686237, at *2 (Third Circuit's guidance on this issue is quite instructive). The plain language of § 3582(c)(1)(A) confirms the Third Circuit's "glaring roadblock" conclusion in *Raia*, and this Court should follow that ruling.

The compassionate release statute provides, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant ***after*** the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A)(emphasis added). The requirement that a defendant either exhaust administrative appeals, or wait 30 days after presenting a request to the warden, ***before*** seeking judicial relief is mandatory and must be enforced by the Court. The plain language of the statute provides that a "court may not modify" a sentence "except" "after the defendant has fully exhausted" administrative appeals from THE BOP's denial "or the lapse of 30 days." This statutory language imposes a mandatory exhaustion requirement and creates no exceptions of the type defendant seeks. The defendant seeks to evade meeting this requirement and still receive full consideration of Covid-19 arguments.

The Supreme Court has rejected "special circumstances" exceptions when a statute imposes a mandatory exhaustion requirement. *See, e.g., Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The "mandatory language" of the statute that the Court considered in *Ross*, the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), "means a court may not excuse a failure to exhaust, even to take" "special circumstances" "into account." *Ross*, 136 S. Ct. at 1856. The Supreme Court continued that exceptions to exhaustion may apply when the exhaustion requirement is judge-made, ***but not*** for statutory exhaustion requirements that have no provision for the asserted exception. "No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amendable to judge-made exceptions." *Id*. at 1857. "But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes *like the PLRA* establish mandatory exhaustion regimes, foreclosing judicial discretion." *Id*.

The Third Circuit in *Raia* is consistent with these principles when it concluded that, because an inmate "failed to comply with § 3582(c)(1)(A)'s exhaustion requirement," that failure "foreclose[ed] compassionate release at this point." 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). "[T]his view appears to dominate among courts that have considered whether they may excuse a failure to satisfy 18 U.S.C. § 3582(c)(1)(A)'s filing requirements." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2 n.1 (E.D. Mich. Apr. 8, 2020).

Many rulings in the Eastern District of Virginia have agreed that exhaustion is required or that, even if there were exceptions, the defendant's arguments about Covid-19 were insufficient to excuse the defendant's failure exhaust. *See, e.g., United States v. Mitchell*, 2:18CR117, ECF No. 48 at 3 (E.D. Va. Apr. 21, 2020) (Davis, C.J.) ("Defendant's failure to satisfy the procedural

obligations for a prisoner-initiated compassionate release motion 'presents a glaring roadblock' to the relief he seeks.") (quoting *Raia*, 2020 WL 1647922 at *2); *United States v. Adams*, No. 1:88CR46, ECF No. 32, at 4 (E.D. Va. Apr. 17, 2020) (Ellis, S.J.) (Section "3582(c)(1)(A)'s exhaustion requirements must still be complied with, even in light of COVID-19"); *United States v. White*, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (Smith, S.J.) ("The court may not consider the Defendant's Motion at this juncture because he has not exhausted his administrative remedies."); *United States v. Bartlett*, No. 4:14CR64, ECF No. 59, at 3, (E.D. Va. Apr. 17, 2020) (Doumar, S.J.) ("The public health emergency caused by the coronavirus is an extremely important consideration that the Court does not take lightly. However, Defendant's Letter Motion fails to establish that Defendant has complied with the procedural requirements of 18 U.S.C. § 3582(c)."); *United States v. Feiling*, No. 3:19CR112 (DJN), 2020 WL 1821457, at *5 (E.D. Va. Apr. 10, 2020) (Novak, J.) ("[T]he mere existence of COVID-19 among the prison population and an inmate's susceptibility to it do not justify waiver of the administrative exhaustion requirement under § 3582(c)(1)(A)."); *cf. United States v. Smith*, No. 2:18CR96, ECF No. 39 at 6 (E.D. Va. Apr. 22, 2020) (Allen, J.) ("[I]t appears that under the plain language of [18 U.S.C. § 3582(c)(1)(A)], Congress intended that the BOP have an opportunity to evaluate and act on a prisoner's motion *before* the Court would be given jurisdiction over such a motion. It did not intend to supplant an agency-exclusive process with an entirely judicial process; it intended to provide a district court with jurisdiction to reduce a sentence without agency action *only if* the agency fails to act within 30 days.").[3]

_____

[3] Many other rulings from district courts in the Fourth Circuit agree. *See, e.g., United States v. Carden*, No. CR JKB-15-0016, 2020 WL 1873951, at *1 (D. Md. Apr. 15, 2020) ("[T]his Court need not make th[e] determination [whether the exhaustion requirement is jurisdictional] to resolve this motion. It is sufficient for purposes of this motion that § 3582(c)(1)(A) mandates that the defendant exhaust his or her administrative remedies prior to

seeking relief in this Court."); *United States v. Fabelo*, No. CR 3:16-00885-MGL-15, 2020 WL 1866449, at *1 (D.S.C. Apr. 14, 2020) ("[Because [defendant] fails to allege he filed a petition with the Warden and exhausted the administrative remedies, he is unentitled, under the statute, to move for the sentence reduction on his own."); *United States v. Chamizo*, No. CR 3:16-00885-MGL-20, 2020 WL 1866448, at *1 (D.S.C. Apr. 14, 2020) (concluding the same); *United States v. Underwood*, No. CR TDC-18-0201, 2020 WL 1820092, at *2 (D. Md. Apr. 10, 2020) ("The Court therefore agrees with other judges in this District and elsewhere that a prisoner must exhaust the administrative appeal process, or wait 30 days, before his claim may be considered."); *United States v. Price*, No. GJH-15-393, 2020 WL 1694347, at *2 (D. Md. Apr. 7, 2020) ("The exhaustion requirements of § 3582(c) are jurisdictional in nature, and the Court may not waive them." (internal quotation marks omitted)); *United States v. Sundblad*, No. CV 6:16-CR-00047-JMC, 2020 WL 1686237, at *2–3 (D.S.C. Apr. 7, 2020) ("'[G]iven BOP's shared desire for a safe and healthy prison environment' this court concludes that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." (quoting *Raia*, 2020 WL 1647922, at *2); *United States v. Ashley*, No. CR RDB-06-0034, 2020 WL 1675994, at *2 (D. Md. Apr. 6, 2020) ("Recently, this Court held that it does not have jurisdiction to adjudicate motions made under 18 U.S.C. § 3582(c)(1)(A)(i), … unless the prisoner first exhausts certain administrative remedies with the Bureau of Prisons … or waits 30 days without a BOP determination."); *United States v. Dungee*, No. 7:15CR00005, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020) (denying motion after concluding that defendant "has not shown that he has exhausted his administrative remedies"); *United States v. Johnson*, No. CR RDB-14-0441, 2020 WL 1663360, at *4 (D. Md. Apr. 3, 2020) (denying motion after concluding that defendant failed to exhaust administrative remedies and that "the Court's jurisdiction is conditioned upon the exhaustion of administrative remedies or the BOP's failure to act after the elapse of 30 days"); *United States v. Sundblad*, No. CV 6:16-CR-00047-JMC, 2020 WL 1650041, at *2 (D.S.C. Apr. 3, 2020) (observing that "this court is also bound by the confines of the law, and a district court does not possess the requisite legal authority to modify or reduce a defendant's sentence under a theory of compassionate release where the defendant has not first petitioned the BOP."); *United States v. Oliver*, 2020 WL 1505899, at *1 (D. Md. Mar. 30, 2020) ("[B]ecause Oliver has not pursued the procedure established by § 3582(c)(1)(A), this Court may not grant a motion to modify her sentence."); *United States v. Williams*, No. JKB-15-0646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020) (finding no exceptions to exhaustion requirement).

Some defendants have sought to invoke certain district court decisions from the Southern District of New York—a district that has been heavily affected by the coronavirus. But even there, the vast majority of decisions—at least 21 so far—have denied Covid-19-related compassionate release motions because defendants had not exhausted their claim with BOP. *See United States v. Ogarro*, No. 18-CR-373-9 (RJS), 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) (Sullivan, Cir. J.); *United States v. Engleson*, No. 13-CR-340-3 (RJS), 2020 WL 1821797, at *1 (S.D.N.Y. Apr. 10, 2020) (Sullivan, Cir. J.); *see also United States v. Demaria*, No. 17 CR. 569 (ER), 2020 WL 1888910, at *3–4 (S.D.N.Y. Apr. 16, 2020*); United States v. Bonventre*, No. 10-CR-228-LTS, 2020 WL 1862638, at *2 (S.D.N.Y. Apr. 14, 2020); *United States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1862251, at *2 (S.D.N.Y. Apr. 14, 2020); *United States v.*

A minority of courts have read the statute as permitting a court to override the 30-day period for THE BOP to review a claim, even though nothing in the text of the statute supports such a reading. These courts have concluded that "Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today." *United States v. Haney*, __F. Supp. 3d__, 2020 WL 1821988, at *3 (S.D.N.Y.); *see also Poulious v. United States*, No. 2:09CR109, 2020 WL 1922775 (E.D. Va. Apr. 21, 2020) (Jackson, J.); *United States v. Jones*, No. 3:11cr249 (E.D. Va. Apr. 3, 2020) (Lauck, J.) (waiving exhaustion requirement after government "did not oppose" defendant's request for compassionate release). Of course, unlike in Jones, the government strongly opposes the request here.

As an initial matter, *Haney*'s approach of adding to statutory language an exception that a court thinks Congress should have included, but did not, fails to accord with the Supreme Court's principles of statutory interpretation. *See, e.g., Sandoz Inc. v. Amgen Inc.*, 137 S. Ct.

---

*Pereyra-Polanco*, No. 19 CR. 10 (NRB), 2020 WL 1862639, at *1 (S.D.N.Y. Apr. 14, 2020); *United States v. Rabadi*, No. 13-CR-353 (KMK), 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020); *United States v. Reese*, No. 12 CR 629 (VM), 2020 WL 1847552, at *2 (S.D.N.Y. Apr. 13, 2020); *United States v. Rensing*, No. 16 CR 442 (VM), 2020 WL 1847782, at *1 (S.D.N.Y. Apr. 13, 2020); *United States v. Fana*, No. 1:19-CR-00011-GHW, 2020 WL 1816193, at *5 (S.D.N.Y. Apr. 10, 2020); *United States v. Matera*, No. 02-CR-743-6 (JMF), 2020 WL 1700250, at *1 (S.D.N.Y. Apr. 8, 2020); *United States v. Roberts*, No. 18-cr-528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020); *United States v. Villanueva*, No. 18-cr-472-3 (KPF), ECF No. 85 (S.D.N.Y. Apr. 8, 2020); *United States v. Carr*, No. 14 CR. 055 (LGS), 2020 WL 1689771, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Miselevich*, No. 16 CR. 763-09 (LGS), 2020 WL 1689779, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Ramos*, No. 14 CR. 484 (LGS), 2020 WL 1685812, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Lowry*, No. 18 Cr. 882 (LTS), 2020 WL 1674060, at *2 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, No. 18-CR-273, 2020 WL 1674137 at *1 (S.D.N.Y. April 6, 2020); *United States v. Woodson*, No. 18-cr-845 (PKC), 2020 WL 1673253, at *3–4 (S.D.N.Y. Apr. 6, 2020); *United States v. Hernandez*, No. 19-cr-834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18-cr-602 (WHP), 2020 WL 1428778, at *2 (S.D.N.Y. Mar. 24, 2020).

1664, 1678 (2017) ("Even if we were persuaded that Amgen had the better of the policy arguments, those arguments could not overcome the statute's plain language, which is our 'primary guide' to Congress' preferred policy."). Just as "the word 'shall' usually creates a mandate, not a liberty," *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018), so too the phrase that "[t]he court may not modify" in § 3582(c) imposes a mandate against judicial action and does not confer discretion. Indeed, while cases like *Haney* point to what a court thinks Congress should have said in § 3582(c), even a statute's preamble or statement of purpose—and defendants can point to nothing like that here—"cannot override [a statute's] operative language." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 220 (2012)).

But cases like *Haney* overlook another important strike against their reading of the statute. In the wake of the novel coronavirus pandemic, Congress did enact a far-reaching statute to address the problems created by the pandemic, the CARES Act, and that law included a specific provision aimed at addressing the virus's spread in prison. As the United States has previously noted, the specific provision, § 12003(b)(2) of the CARES Act, broadened *THE BOP's powers* under § 3624(c)(2) to release inmates on home confinement. *See, e.g., United States v. White*, No. 2:07CR150, 2020 WL1906845, at *1 (E.D. Va. Apr. 17, 2020) (Smith, S.J.) (Section 3624(c)(2), as amended by § 12003(b)(2) of the CARES ACT, "does not authorize the court to place a defendant in home confinement."). Congress did not alter the exhaustion requirement in § 3582(c)(1)(A).

Later enacted statutes, like § 12003(b)(2) of the CARES Act, are informative when a court seeks to find an unstated exception to the exhaustion requirement in § 3582(c)(1)(A), for "the meaning of one statute may be affected by other Acts, particularly where Congress has

spoken subsequently and more specifically to the topic at hand." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Here, in response to the coronavirus pandemic, Congress gave THE BOP the power to act but did not remove the 30-day requirement for courts to act under § 3582(c)(1)(A). And this legislative scheme makes sense. The BOP is better positioned to address the problem, and it would make little sense for a court to override the language of § 3582(c)(1)(A) that the BOP be given an opportunity to act first—when Congress just handed the BOP, and the BOP alone, expanded powers to act.

As discussed below, the requirement of a 30-day period for review by BOP is also jurisdictional, but because the United States is asserting the requirement here, it does not make a difference whether the rule is jurisdictional or not. The rule is at a minimum a mandatory claims-processing rule, requiring a court to enforce the rule when it is invoked even if it is not jurisdictional. *See, e.g., United States v. Manrique*, 137 S. Ct. 1266, 1272 (2018) ("Mandatory claim-processing rules 'seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," and when a party "properly raise[s] them," they "are 'unalterable.'") (citations omitted).

### 2. The 30-day exhaustion requirement in § 3582(c)(1)(A) is jurisdictional.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence.

Rather, it may do so only pursuant to express statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979). As the Fourth Circuit has explained, § 3582(c) "states that a district court 'may not modify a term of imprisonment once it has been imposed' unless the Bureau of Prisons moves for a reduction, the Sentencing Commission amends the applicable Guidelines range, or another statute or Rule 35 *expressly* permits the court to do so." *United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010). "[T]here is no 'inherent authority' for a district court to modify a sentence as it pleases." *Id.* (quoting *United States v. Cunningham*, 554 F.3d 703, 708 (7th Cir. 2009)); *see also United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Section 3582(c)(1)(A) speaks directly in terms of a court's adjudicatory power and says "[t]he court may not modify a term of imprisonment once it has been imposed except" in the circumstances enumerated in § 3582(c). Section 3582(c)(1)(A) thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the legal backdrop against which § 3582(c) was enacted. At common law a court could not modify a final judgment in a criminal case after the expiration of the court term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). After the Federal Rules of Criminal Procedure prescribed a specific window of time during which a court could modify a criminal

sentence, the Supreme Court continued to treat these time limits as jurisdictional.  *See United States v. Smith*, 331 U.S. 469, 473 n. 2 (1947); *Addonizio*, 442 U.S. at 189 n.17.  Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[4]

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary.  *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019).  A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id*. at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).  But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision.  *Henderson*, 562 U.S. at 436.  Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district

---

4  A number of courts have recognized that the prerequisites for relief under Section 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional.  *See, e.g.*, *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *overruled on other grounds by United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016); *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and Section 3582(c)(1)(B) remain jurisdictional after *Bowles*).  Other courts disagree.  *See, e.g.*, *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

court lacks jurisdiction to consider a motion for compassionate release where the defendant has failed to satisfy the exhaustion requirement of Section 3582(c)(1)(A).[5]

Some courts, including the Fourth Circuit, have concluded that reconsideration of a motion for relief under a retroactive guideline amendment pursuant to 18 U.S.C. § 3582(c)(2) is not jurisdictionally barred. *See, e.g., United States v. May*, 885 F.3d 271, 275 (4th Cir. 2017) (citing cases from the 3d, 7th, 9th, and 11th Circuits). But *May* was not presented with, and did not decide, the question whether the entirety of § 3582(c) is non-jurisdictional, and hence, *May* did not decide that a court may revisit a sentence whenever it wants, as long as a party does not object. Even courts that agree with *May* continue to recognize that § 3582(c) imposes jurisdictional limits. *See, e.g., United States v. Simon*, 952 F.3d 848, 852 (7th Cir. 2020) ("Once a court sentences a criminal defendant, it has jurisdiction to continue hearing related issues only when authorized by statute or rule.") (citations omitted); *United States v. Green*, 886 F.3d 1300, 1305 (10th Cir. 2018) (treating 14-day time limit in Fed. R. Crim. P. 35(a), which § 3582(c)(1)(B) incorporates, as jurisdictional, but distinguishing limitation on successive motions or reconsideration of a motion under § 3582(c)(2) and deeming that limitation not jurisdictional); *United States v. Mercado-Flores*, 872 F.3d 25, 29 (1st Cir. 2017) (finding 14-day limit in Rule 35(a) to be jurisdictional).

While the government maintains that the time limitation in Section 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic here. Even if the

---

5   Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden. If the BOP rejects the request or takes no action within the 30 day window, the inmate is then free to press his position in the appropriate federal court.

exhaustion requirement of § 3582(c)(1)(A) were not jurisdictional, it is at least a mandatory

claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S.

at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within

14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The

government raises the rule here, and it must be enforced.[6]

### 3. Exhaustion properly provides BOP with an opportunity to assess the claim.

Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the

defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of

Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of

such a request by the warden of the defendant's facility, whichever is earlier."[7] The requirement

of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be

excused. While Congress indisputably acted in the First Step Act to expand the availability of

compassionate release, it expressly imposed on inmates the requirement of initial resort to

administrative remedies. And this is for good reason: The Bureau of Prisons carefully reviews

and considers such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50,

Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C.

§§ 3582(c)(1)(A) and 4205(g), available at

---

6 Indeed, even those courts that have concluded that the requirements of
Section 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *Taylor*, 778 F.3d at 670 (recognizing that even if a court has the "power to adjudicate" a motion under Section 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

7 Unlike the exhaustion provision in *Ross*, which required only exhaustion of "available" administrative remedies, 136 S. Ct. at 1858, the compassionate release statute contains no such exception.

https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  As the Procedures reflect, the Bureau of Prisons possesses considerable expertise concerning both the inmate and the conditions of confinement.  Its assessment will always be of value to the parties and the Court.

BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities.  The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time.  As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."  *Raia*, 2020 WL 1647922, at *2.  Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

### 4. The exhaustion requirement should not be waived.

The defendant invites the Court to ignore the statute requirement and established procedure and simply waive the requirement.  Defendant is essentially arguing that since the defendant is entitled to reduction because of the Covid-19 threat, the rules should be scrapped.  The defendant is in error.  As noted above, the Supreme Court has rejected the defendant's "special circumstances" argument (Defendant's Motion, p. 11) made here.  Ross, 136 S.Ct. at 1856.  See also, Raia, 2020 WL 1647922 at *2.  As cited above, the Eastern District of Virginia and other districts of the Fourth Circuit have consistently rejected the defendant's waiver argument.

Even if a court could discard the 30-day requirement in § 3582(c)(1)(A), courts should not do so. *See United States v. Feiling*, 2020 WL 1821457, at *5 (E.D. Va. Apr. 14, 2020) ([T]he mere existence of COVID-19 among the prison population and an inmate's susceptibility to it do not justify waiver of the administrative exhaustion requirement under § 3582(c)(1)(A)."). The defendant presumes entitlement to release and therefore the applicable rules on how and in what manner the claim should be reviewed should be ignored. The Court should decline the invitation.

### 5. The defendant has not complied with the administrative consideration notice requirement.

The defendant recognizes he is required to request a sentence reduction first from the BOP before he may obtain relief by this motion. The defendant attempts to show he has complied in two ways. First, he alleges that Mr. Wyatt's family submitted on April 1, 2020, a written request to the warden for Mr. Wyatt's compassionate release. Motion of Defendant, p.4. There is no such request in the Butner medical file. Defendant does acknowledge in a footnote that "[c]ounsel has not been able to obtain a copy of this letter from Mr. Wyatt's family as the only copy was sent to the warden. The family believes that this request was for compassionate release as contemplated by 18 U.S.C. § 3582(c)(1)(A) as opposed to home confinement under the CARES Act." Motion of Defendant, p.4 n.4. There is a no record of it being sent to the warden. There is no corroboration of the alleged date of the letter. Most importantly, the most in candor the defendant can state is the family "***believes***" the request was for compassionate release rather than home confinement under the CARES Act. Motion of Defendant, p.4 n.4. Were the request sent in as supposed, an administrative process would have started and been reflected in the file. The absence of such is telling. F.R.E. 803(7). Where the letter went, and to whom, on what date, and requesting what is not established here.

Second, the defendant claims that on "April 17, 2020, Mr. Wyatt himself was able to submit an email request to the prison staff requesting his compassionate release." Motion of Defendant, p.4. The defendant does not attach a copy of the email. There is no such email in the Butner medical file. Again, the absence is telling. There are other emails sent by the defendant for certain medical matters such as foot care so had it been sent it would be in the file. Beyond the defendant's bare assertion, it is unknown if an email was sent, when it was sent, to whom it was sent, and what was requested. The defendant has not established the email request was made.

The only actual request by the defendant the records do show is that on May 5, 2020, the defendant submitted a form BP-A014B request for compassionate release claiming he was "medically debilitated." On May 7, 2020, the medical staff reviewed the request and determined he does not meet the debilitated medical criteria. On May 12, 2020, a denial memo was routed for the Warden's signature, but has not been signed yet. Thus the 30 day required period has not yet run.[8]

## II. The motion is without merit.

### A. Defendant's motion should be evaluated against a practical and legal backdrop.

The Federal Bureau of Prisons is actively working on the critical problem of containing the spread of the coronavirus within prisons. The BOP has, among other steps, limited access to

---

[8] An inmate must wait 30 days from presenting the request to the Warden. On this matter, the Warden still has discretion despite the staff recommendation. If the Warden denies the request within that 30 days, that's not a final agency decision and inmate must appeal through the BOP's administrative remedy process. Under the regulations, the Warden can't actually grant a compassionate release. The Warden can only review it to see if basic criteria is met, and if so, it them moves to the BOP's Central Office for final review. Only the Director, or the Court, can actually grant a compassionate release. See, Program Statement on Compassionate Release, https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided the "Bureau of Prisons" with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to the BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting the BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of the BOP.[9] The Attorney General made those findings on April 3, 2020, conferring on the BOP the authority to expand its use of home confinement.

As of May 26, 2020, the BOP reports the BOP has 136,959 federal inmates in BOP-managed institutions and 12,106 in community-based facilities. The BOP staff complement is approximately 36,000. There are 1577 federal inmates and 181 BOP staff who have confirmed

---

9 Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

positive test results for COVID-19 nationwide. Currently, 3180 inmates and 413 staff have recovered. There have been 64 federal inmate deaths and 0 BOP staff member deaths attributed to COVID-19 disease. The BOP has placed 3,183 inmates on home confinement. (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released. Inmates do not have to apply to be considered for home confinement.

The BOP's releases of inmates to home confinement must take into account, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. The BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, the BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement. By having the BOP control the 14-day period of quarantine—rather than leaving inmates to conduct their own quarantines after release—the BOP can ensure the effectiveness of the quarantine and evaluate the appropriateness of any determination that the inmate is not a carrier of the coronavirus.

In addition to these efforts to increase the use of home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, the BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Current modified operations plan require that all inmates in the BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, the BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for Covid-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of the BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, the BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of the BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Experience is now showing these prevention and control measures are effective. For example, very recently on May 17, 2020, the Virginian-Pilot reported that the Norfolk Sheriff's Office appeared to have snuffed out an outbreak of the coronavirus in the city's jail. Fifty-five of the jail's roughly 1,000 inmates and deputies ultimately tested positive for the virus during an expansive testing campaign by the Sheriff's Office, Virginia Department of Health and Sentara Healthcare. But the 45 inmates and 10 deputies who contracted the coronavirus have since recovered. Health officials have allowed the once-infected deputies to return to work, and the inmates were moved out of the jail's "hot" zone. By a series of measures similar to those in the Bureau of Prisons, the Norfolk Sheriff's Office snuffed out an outbreak of the coronavirus in the city's jail.

Rather than relying on the BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the

tools of litigation to replicate, and potentially override, the BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

Under the present circumstances, courts are not well positioned to evaluate a range of quickly changing facts:

- *Safety of place of home detention.* An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.* The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12 New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.* Any release should include measure to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Avoiding misallocation of testing resources.* Any request by an inmate should appropriately triage the use of available testing by medical need, not by an unsystematic series of court orders.

- *Addressing the need for food, housing, medical care, transportation, employment, and other necessities.* Any release order should evaluate whether a released inmate could find—during a pandemic—food, medical care, housing, safe (often interstate) transportation needed to relocate from prison to the inmate's home, and employment during a time when an extraordinarily large number of people are losing their jobs.

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

- *Making release decisions fast enough and accurately enough to make a difference.* An inmate's release request requires a court to determine accurately, with appropriate records, how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison.

- *Appropriately prioritizing supervision resources.* The Probation Office's resources to supervise released inmates are necessarily limited, and any inmate's

release should be assessed against the comparative advantages that another inmate

might receive from those same supervisory resources.

To avoid a mass release of inmates that has a serious, negative effect on public welfare, the

Court should also take into account the risk to probation officers, police officers, and others who

must immediately cope with and supervise released inmates.

This list is not exhaustive and, indeed, could include many additional considerations.

The point is that the factors cited above illustrate a general truth—there are no known examples

of effectively litigating out of a crisis by taking up thousands of cases simultaneously in

hundreds of courtrooms across the country and attempting to have the judicial process evaluate

prisoner releases in a pandemic that changes daily and even hourly.  A more systematic remedy

than individual litigation in court is needed, and Congress provided a means for arriving at a

more systematic response by amending § 3624(c)(2) while the pandemic is ongoing.

The BOP has a massively important task ahead of it.  Layering the burdens of a huge volume of

emergency litigation on top of the difficult challenges that the pandemic has handed BOP is

unhelpful.  And it is likely to incentivize a counterproductive race to the courthouse in countless

cases—a race that will necessarily require this Court to mete out limited re-entry and supervision

resources on a first-come-first-serve basis that favors defendants who flout the administrative

processes in place to prioritize release for the most vulnerable and least dangerous.

The statistics cited above concerning number of cases , recoveries, and deaths demonstrate these

measures are being effective.  The above points inform the legal framework discussed below.

**B.  The defendant cannot establish "Extraordinary and Compelling Reasons" to warrant a substantial sentence reduction.**

Even if this Court were to determine that the defendant can overcome the statutory 30-

day requirement for BOP review, release is not appropriate because he cannot establish

"extraordinary and compelling reasons to warrant such a reduction" under 3582(C)(1)(A)(i), or as 3553(a) factors.

A § 3582(c)(1)(A) sentencing-reduction motion is not a flexible equitable remedy equivalent to clemency or parole. Instead, Congress has created a narrow statutory framework in which defendants, the Bureau of Prisons, and the Sentencing Commission all play a relevant part. The defendant is still subject to this framework in evaluating his medical claims here. To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release. Instead, it has delegated that responsibility to the Sentencing Commission through several statutory provisions. For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18." Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In its instructions to the Sentencing Commission, however, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under § 3582(c)(1)(A). U.S.S.G. § 1B1.13. First, a court must conclude that "[e]xtraordinary and compelling reasons warrant the reduction." Id. § 1B1.13(1)(A). Second, the court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the

community, as provided in 18 U.S.C. § 3142(g)."  Id. § 1B1.13(2).  Third, the court must

conclude that "[t]he reduction is consistent with this policy statement."  Id. § 1B1.13(3).

The Sentencing Commission has also identified four categories of extraordinary and compelling

reasons:

> (A)      Medical Condition of the Defendant;
> (B)      Age of the Defendant;
> (C)      Family Circumstances; and
> (D)      Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1.  Commentary to § 1B1.13, in turn, clarifies that the open-ended

provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s

determined by the Director of the Bureau of Prisons, there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with, the reasons described in

subdivisions (A) through (C)."  Id.

      Consistent with subdivision (D), the Bureau of Prisons has identified several

nonexclusive factors for determining whether "other" extraordinary and compelling reasons

exist.  These include the defendant's criminal and personal history, the nature of his offense,

disciplinary infractions, length of sentence and amount of time served, current age and age at the

time of offense and sentencing, release plans, and "[w]hether release would minimize the

severity of the offense."  BOP Program Statement 5050.50 (Jan. 17, 2019), available at

https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  The Program Statement explains that

the Bureau of Prisons authorizes compassionate release under § 3582(c)(1)(A) in "particularly

extraordinary or compelling circumstances which could not reasonably have been foreseen by

the court at the time of sentencing."  Id. at 1.

      Ultimately, it is the defendant's burden to prove that he is entitled to compassionate

release under § 3582(c)(1)(A)(i).  See White v. United States, 378 F. Supp. 3d 784, 785 (W.D.

Mo. 2019); *see generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

Courts have properly concluded that a risk of being infected by the coronavirus fails by itself to justify compassionate release. [I]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19CR112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).

In the instant case, the defendant has failed to demonstrate that he runs a "particularized risk" of contracting COVID-19 at his prison facility. In fact, there are no cases at his facility unit. At Butner Low as a whole, the BOP reports on May 26, 2020 at https://www.bop.gov/coronavirus/index.jsp there are 107 inmates positive, 3 staff positive, 1 inmate death, 40 inmate recoveries, and 6 staff recoveries. So the defendant's entire argument at present is essentially hypothetical.

More importantly, the defendant provides no evidence that he suffers from any medical condition that renders him "particularly susceptible" to COVID-19. The defendant is relatively healthy with no serious underlying medical conditions. Out of the four "extraordinary and compelling reasons" identified by the Sentencing Commission listed above, the defendant does not qualify under any and has failed to demonstrate any "extraordinary and compelling reasons other than, or in combination with" another condition that would justify abrogation of his sentence.

**C. The general reference to Covid-19 existence and the possibility of it getting into a prison population is an inadequate basis for this relief sought.**

The defendant here wants to argue basically that because of the danger of Covid-19, and the nature of prisons, any prisoner with any health issue should be immediately released. That proposition is without merit. The Third Circuit recently, in candor, rejected the defendant's generic argument, writing,

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM).

*Raia,* 2020 WL 1647922, at *8. *See also, Sundblad*, 2020 WL 1686237, at *3.

**D. The defendant has not met his burden to demonstrate medical conditions justifying release.**

In the instant case, the defendant has failed to demonstrate that he runs a "particularized risk" of contracting COVID-19 at his prison facility. While the defendant has referenced general statistics and reports, the defendant has not referenced any cases in his area.[10] In fact, as reported by the Butner BOP[11] to the undersigned on May 23, 2020, there are no cases at the medical unit of his facility where he is assigned. Moreover, the defendant is assigned to the

---

10 The defendant does cite to seven deaths in the Butner general population. Defendants' Motion, p. 2. The defendant does not address the medical conditions of those individuals or the area they were assigned to. The defendant does not isolate if the deaths involved the same set of medical circumstances as the defendant. Even the brief summary demonstrates the deaths involved 6 men much older (ages 81, 78, 73, 67, 58, 57) than the 51 year old defendant. The general references do not establish the standard the defendant must meet.

11 Upon receipt of the Court's response Order, the United States contacted the BOP to obtain the records and most recent case statistics. Just as the defendant was not able to obtain particular records (see Defendant's Motion, p,4 n.4), the United States faced some practical difficulties in preparing a full response in the time allotted as to documents that could not be prepared and obtained due to the short response time and as it straddled the Memorial Day weekend.. The United States requests leave to supplement this filing with such affidavits as necessary

medical care/hospital unit and as such has much better care and prevention procedures than might be elsewhere in different facilities so references to total BOP statistics is not applicable.

The defendant is being particularly protected by the measures in place. The records show for instance that the defendant has recently been tested for Covid-19 and the test was returned negative on May 23, 2020. 5/23/20 Test Report. The records also show a regular screening process in place for inmates in his unit. See, Medical reports 4/29/20, and 5/14/20. In response to the virus risk, and even though the defendant reported no symptoms and in fact was determined to have no symptoms, he has (as set out in the care summary records) been under precautionary quarantine rules from April 30, 2020 through May 21, 2020 (terminated following the negative test). These are just some of the heightened procedures being followed at the BOP, and in particular in this medical unit for this particular defendant, to address any risk of contracting the virus. So the defendant's entire argument at present is simply hypothetical.

More importantly, the defendant provides no evidence that he suffers from any medical condition that renders him "particularly susceptible" to COVID-19. The defendant, who is now 51 years old, is actually relatively healthy with no serious underlying medical conditions.

The defendant has asserted in broad generalities on only one page basically just listing conditions without details. Defendant's Motion, p. 20. The defendant argues based on those generalities that because he has certain medical conditions, and because Covid-19 is a danger even though not even present at his unit of the Butner BOP facility, he is entitled to immediate release. The generalized argument is without factual merit.

Carefully reviewing the multiple claims of defendant, compared to the actual circumstances and medical condition of the defendant as detailed in the filed medical records, demonstrates at most these claims are not supported by the records. While the defendant

references a health condition leaving the specter of seriousness there but unsubstantiated, from a review of the medical file, as set out below, the defendant's conditions are not current, have been treated successfully, are under control, and in any event are not tied in the defendant's filing to any particular susceptibility to the Covid-19 virus. Out of the four "extraordinary and compelling reasons" identified by the Sentencing Commission listed above, the defendant does not qualify under any and has failed to demonstrate any "extraordinary and compelling reasons other than, or in combination with" another condition that would justify abrogation of his sentence of which he has only served 51%. Addressing each of the defendant's medical claims and assertions in order demonstrates there is no basis for the immediate release motion.

**1. The defendant cannot establish a particular susceptibility of the defendant to Covid-19.**

The defendant claims the defendant is particularly susceptible to COVID-19 by virtue of "a number of comorbidities that significantly increase his risk of severe or fatal reaction to Covid-19; hypertension, heart disease, prostate cancer, high cholesterol and diabetes." Defendant's Motion, p. 20. However, a review of the general assertion here as applied to the medical records defendant filed establishes this is simply not so. In fact, the defendant has been

examined by medical personnel in response to the defendant's complaints multiple times[12] in the

last two years.  There is no reference in the records[13] to any immunocompromising conditions.

---

[12] It should be noted that this defendant receives a very high degree of medical attention and care by virtue of the BOP procedures.  The records show a regular testing of blood, detection and treatment of a variety of conditions such as low Vitamin D (4/22/20 Medical Examination/Prescription), EKG exams (2/5, 27/20 Examination Reports), ophthalmological examination for floaters and care (1/28/20 Ophthalmological Examination Report), colonoscopy examination (9/5, 10/20 Examination Report), yearly preventative health examinations (8/15/19 Preventative Physical Comprehensive Examination Report), chest x-rays for bronchitis or possible pneumonia (8/8/19  X-ray Report),and regular dental examination and care .  The regular provision of these extensive medical services also obviously lessens the likelihood of contracting a disease or it not being detected.  Moreover, were the defendant to be released, as someone without any income or assets, without medical insurance, and dependent on a planned application for Social Security benefits, he is actually not going to have this high level of medical care and is most likely in greater health  danger out in the community.  The need for health care is a sentencing factor.  18 U.S.C. §3553(a)(2)(D).

[13] The alleged connections are the general news reports or government summary reports about possible connections to certain diseases based on incomplete accumulated data.  However, the cited reports do not reference the specific circumstances of this defendant.  For example, the defendant has filed an affidavit of Steven Edelman, MD..  Any review of the affidavit establishes the point that generalities do not establish the standard.  The affidavit is general only.  It does not reference any of the defendant's medical records or specific conditions.  There is no indication the affiant has ever consulted the defendant or the defendant's medical records.  Rather, the affidavit says that in general uncontrolled diabetes, and poor glucose control present dangers for diabetic inmates if they are not tested for diabetes.  Edelman Affidavit, paragraph 14.  But the Edelman affidavit does not address the defendant's actual blood glucose level, does not address the defendant's current condition, does not address that in fact the defendant has controlled this for many years by diet alone, and the defendant is regularly tested by blood panel.  Moreover, the affidavit only addresses jails in general and does not indicate any awareness of procedures and practices at the Butner Medical Unit where the defendant works as an orderly, the procedures now in place for screening, quarantining and testing for the virus, or the level of danger of infection at this specific facility.  For addressing the standard to be met here, the affidavit is plainly insufficient.

     As for cited government reports, the defendant correctly notes that the connection drawn by the C.D.C. and the New York Department of health are applicable to serious heart conditions, immunocompromised due to cancer, and serious diabetes.  Defendant's Motion, p. 21.  Yet again, the defendant does not reference what is a serious condition in each report.  The defendant certainly does not establish, as noted below, that he in particular has such serious heart conditions, immunocompromised due to cancer, and serious uncontrolled diabetes as to make those cited reports applicable to him personally.

In addition, the defendant claims each of his conditions have been proven to be associated with a higher risk of death or serious complications from the coronavirus. As is set out below, the claim of such a connection is simply unwarranted.

       **2. The defendant has not established he is seriously medically debilitated to an extraordinary and compelling level.**

In a shotgun listing approach, the defendant claims the defendant is seriously medically debilitated in many respects, and has suffered continuously and significantly in prison due to his many medical complications he has endured while incarcerated. Defendant's Motion, p. 20. However, a review of the medical records sets out the conditions set forth in the defendant's filing are hardly serious, were in the past, have been thoroughly examined, and have been successfully treated. A review of each identified condition or illness shows the claimed conditions is not accurate.

       **a. High Blood Pressure/hypertension.**

The defendant first asserts he has high blood pressure and hypertension making him more susceptible. The medical records and citations to them in the Defendant's Motion do show that the defendant has had some level of elevated blood pressure. But that is not the entire situation and there is no great severity for this defendant from this very normal condition. The records show nothing unusual about the defendant's blood pressure. Readings over the last several months have ranged mildly but are hardly a serious medical issue.[14] The records show the condition has been noted and is being appropriately monitored. The defendant has been

---

14 Examinations on the following dates recorded the following blood pressure readings: 7/1/19 [156/95], 7/11/19 [139/79], 7/22/19 [136/84, and 156/82], 8/5/19 [153/90], 8/15/19 [158/92], 11/4/19 [167/89], 11/5/19 [151/91], 11/14/19 [149/89], 11/21/19 [153/90], 1/27/120 [153/84], 1/31/20 [144/86], 2/4/20 [146/83], 2/19/20 [151/88], 2/28/20 [148/90].

prescribed a standard low dose medication (Lisinopril).[15]  The medical records do show the defendant has been given appropriate medications for this condition as well as being counseled to change his diet and lose weight.  See  Defendant's Motion, p.20.  While the defendant may be correct as asserted that *uncontrolled*[16] blood pressure would be a serious problem, that is not the defendant's condition here.

If there is any problem here, it is that the defendant does not always take his medication. For example, in December 2019, the blood pressure was noted to be elevated and the defendant stated "he does not take the Lisinopril because he read that it was bad for black men." 12/11/19 Examination Report.  Despite counseling the defendant has continued his noncompliance.  In February 2020, the defendant cut his Lisinopril dosage in half on his own over a concern about headaches and was deemed non-compliant.  2/4/20 Examination report.  He certainly should not benefit from his refusal to follow medical directions.

The defendant does not establish that he is not being given appropriate and effective care, does not address that his current medications are effective, and establishes nothing to make this very common condition a serious problem justifying release.  Finally, the defendant certainly does not establish any link from *his* set of BP readings to increased susceptibility to Covid-19.

### b.  Heart Disease.

The defendant references this item without explanation or discussion.  The defendant references in general that at some point the defendant had suffered two heart attacks and had received two stents.  Defendant's Motion, p. 20.  The defendant gives no further information and does not elaborate on the circumstances of the heart attacks, causes or severity.  There is nothing

---

15  4/21/20 Examination Report; 2/4/20 Examination report, 12/11/19 Examination Report.
16  Defendant's Motion, p. 20.

here except the term "heart attack." The argument is left with a only suggestion of seriousness, with the connection to Covid-19 being for "serious heart disease" and an ***assumption*** the defendant must therefore have serious heart disease. From a careful review of the medical records, the reality is quite different.

In fact, it was a condition long ago. In fact, there are no records in the Butner medical file about the claimed heart attacks and stents. Rather, there is a reference to the defendant reporting that he couldn't remember when, "sometime on the 2000's," he had heart attacks and got stents. 8/15/19 Examination Report. There is nothing aside from the defendant's own bare report as to the nature of the attacks, when they occurred, their severity, or the procedures followed. It is well known that angioplasty is a minimally invasive procedure and by catheter procedure done on an almost outpatient basis. There is no information as to the degree of blockage necessitating a stent, and whether there was any lasting damage to the heart tissue. The medical record certainly suggest they were not "serious" incidents. Examination has shown the cardiovascular function "within normal limits." 7/22/19 Examination Report. His EKG's, while unsurprisingly showing some slight plaqueing, are stable with no acute changes. His 2/7/20 echocardiogram showed no significant results. So there is simply nothing here except perhaps medical innuendo to say he has "serious" heart disease which makes him particularly susceptible to Covid-19. The defendant does not establish any connection between his self-reported heart attacks near 15-20 years ago, and Covid-19. The defendant has not met his burden to show any impact of this condition.

**c. Prostate cancer.**

The defendant is correct he had treatment for prostate cancer. However, the defendant suggests he still has it and that it makes him particularly susceptible now. These suggestions are not correct.

Rather, the oncology summary report shows that prostate cancer was detected on July 3, 2018. 8/26/19 Summary Report. The oncologist recommended surgery but the defendant refused. Instead, the defendant elected to have 42 radiation treatments between October 24, 2018 and December 28, 2018. The summary report notes he tolerated the treatments well and afterward his condition was quite good. His pre-test PSA was 6.45. His post-treatment PSA was .93. As a result, the defendant is not receiving further treatment.[17]

It is noted that the defendant does now have an enlarged prostate condition. 5/22/20 Oncology Unit Examination Report. He has been prescribed the brand Flomax (Tamsulosin HCI) for 45 days because there is a urinary retention indication. He has been diagnosed with "benign prostatic hyperplasia" which is simply a non-cancerous age associate prostate gland enlargement. See https://www.webmd.com/drugs/2/drug-1592/tamsulosin-oral/details; https://www.drugs.com/tamsulosin.html. The drug relaxes muscles in the prostate and bladder neck to ease the condition. This is ***not*** a continuation of the earlier cancer. It does not have any immunological compromising aspects. It is a no significance for the defendant's motion.

---

[17] The undersigned could not find in the records received the defendant's reference to an increase in proteins. Defendant's Motion, p. 20. Even so, the defendant does not identify the nature of the treatment being given; just that he is being "cared for" because of this. There is no information as to the likelihood of a return of the prostate cancer. There is no information as to the nature of the "care" or that in any way the defendant is immunologically impacted by this circumstance. This clearly does not meet his burden.

The only continuing related conditions noted in the records are treatment for a UTI (10/28/19 Examination report), and a prescription for an over active bladder (12/23/19 and 4/21/20 Medical Examination Reports)

The medical examination reports show the cancer is gone. His latest PSA is 0.62 (4/21/20 PSA Test Report), and anything up to 2.5 is deemed "safe" and "normal." *See* https://www.webmd.com/prostate-cancer/guide/psa. It was recommended he have quarterly PSA tests for 2 years, semi-annual PSA tests in year 3, and then annually after 5 years. The case was a success. There is no reference in the records that anything in the procedures or outcome has in any way compromised him immunologically. That is left as an innuendo of the term "radiation treatment."

In any event, the records show the defendant received constant examination and appropriate, successful care. While the defendant quotes to references at the start of the condition, he omits the ultimate conclusion. Here again ,the defendant has not shown any connection of this condition to being in prison. As well, the defendant does not show any connection to susceptibility to Covid-19 as a result of this resolved condition. This brief medical condition does not support the release the defendant seeks.

### d. "High" cholesterol.

The defendant makes a single reference to the defendant having "high" cholesterol and that it is often associated with diabetes. A leap is implied that this condition then makes the defendant more susceptible to Covid-19 though even that is not alleged directly and there is no support for such a leap.

The records contradict the defendant's general suggestions here. The defendant's relevant blood panel on July 15, 2019 showed a cholesterol level of 200 (<200), triglycerides 81 (<150), HDL Cholesterol 51 (40-60), LDL 133 (<130), and the cholesterol/HDL ratio at 3.9 (0-4). This is hardly any significant or impactful condition. Rather than "high," it is still essentially in the normal ranges indicated. And the August 15, 2019 Examination report notes the defendant

is controlling the cholesterol by diet.  So it is being monitored but no medication or other treatment process has been ordered.

Here again ,the defendant has not shown any connection of this condition to being in prison.  As well, the defendant does not show any connection to susceptibility to Covid-19 as a result of this resolved condition.  This brief medical condition does not support a 50% cut in his sentence and  the release the defendant demands.

### e.  Diabetes.

The defendant makes this generalized assertion.  Yet the records do not support this general assertion concerning diabetes.

There do not appear to be any treatment references to diabetes in the medical records from Butner.  A February 14, *2014* Health Summary report does state the defendant's diabetes was under control by diet, in remission, and he had an A1c of 5.9 which is at most pre-diabetic. However, there are no references to any diabetes medication.  In a July 15, 2019 blood panel, the defendant's glucose was 93 (70-109 mgdl).  Two months later on September 9, 2019, the blood panel showed a glucose of 101 (70-109).  In November 22, 2019, the defendant's A1c was 5.6 (4-5.7), and his mAlB/creat ratio was 8 (0-29 range).  Finally, a January 28, 2020 eye examination by a doctor reports he "is also a diet controlled diabetic without diabetic retinopathy."  In short, the defendant does not suffer from diabetes, controlled or uncontrolled. Of course, this can be controlled by diet.  And in fact, the blood panels included in the Butner medical records show nothing significant concerning this assertion.  Once again, there is no condition here justifying release, and there is no connection to susceptibility to Covid-19 from a non-existent problem.

### f.  Self-inflicted medical issues.

As already noted above, to a degree, the records also indicate the defendant has contributed to his conditions. For example, he has declined flu vaccination.[18] There are also references to his non-compliance with ordered medications. Elsewhere it is clear the defendant's claimed hypertension is the result of his medication noncompliance. Examination Reports, 1/23/12, 1/21-22/20, 2/5/20. To the extent these have contributed to his current conditions, he should not be allowed to profit from them.

**E. The defendant has not presented an adequate release plan.**

With respect to the defendant's release plan, he advocates for this Court to release him to serve the remainder of his sentence in "home confinement" at his fiance's residence in Henrico County, Virginia. Henrico County reported on its website May 26, 2020 that there were 1,083 cases and 110 deaths. It is hardly a safer environment.

The defendant also fails to address why his release on home confinement in Henrico County would be less risky than remaining at his current facility where there are zero cases of COVID-19, and rigorous procedures are in place to prevent the introduction and spread of the virus into the facility. *See*, *e.g*., *United States v. Feiling*, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020) ("More importantly, even if COVID-19 cases eventually emerge at FCI Loretto, Defendant fails to establish how his release on home confinement presents a viable alternative sentence. Indeed, Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety."). In addition, because the defendant has no means to obtain medical care (no assets, no insurance and dependent on a future Social Security application), he would certainly be at greater risk.

**F. The circumstances of the defendant's case, as fully presented in the prior denied First Step Act motion, outweigh the defendant's argument now.**

---

18 Examination Report, 9/22/29.

The defendant in his motion reargues the First Step Act factors. Defendant's Motion, pp. 21-24. Of course, this is illustrates exactly why there is no jurisdiction for this motion while the very First Step Act denial is on appeal. There is simply no jurisdictional basis for a motion to reconsider the denial while an appeal is pending.

Considering the BOP's Program Statement referenced above, the defendant's general health, criminal record, personal history, the nature of his offense, disciplinary infractions, length of sentence, amount of time served, current age, and his release plans, all weigh heavily against his arguments here. The defendant's medical conditions, as minor, non-existent, or being successfully treated do not outweigh these factors all as stated more fully in the opposition to the First Step Motion itself.

In any event, the Court's prior conclusions in denying the First Step Act motion remain law of the case. As for the underlying conviction, the circumstances of which are balanced against issues raised in a Compassionate Release motion, the Court found:

> Rodney Lorenzo Wyatt, Jr. pled guilty to conspiracy to distribute, and possession with intent to distribute, fifty (50) grams or more of cocaine base and 500 grams or more of cocaine hydrochloride in violation of 21 U.S.C. § 846. The record shows that, between October 1, 2008 and continuing through April 1, 2009, the defendant distributed significant amounts of crack cocaine and powder cocaine to drug dealers. Indeed, he acknowledged that, during the time at issue, he purchased for distribution one ounce of cocaine hydrochloride at least ten times; 62 grams of cocaine hydrochloride at least six times; and 125 grams of cocaine hydrochloride at least five times for a total of 1,277 grams of cocaine hydrochloride, much of which was cooked into crack cocaine. Wyatt also acknowledges that, during the conspiracy, he purchased for redistribution one ounce of crack cocaine at least ten times, 62 grams of crack cocaine at least three times, and 125 grams of crack cocaine at least three times for a total of 841 grams of crack cocaine. On September 11, 2009, the defendant was sentenced to 262 months confinement based upon the career offender provision that resulted from two convictions of drug trafficking offenses.

November 19, 2019 Memorandum Opinion, p. 2.  The defendant does not address the particularly egregious nature of the underlying crime.  And the defendant cannot use the Rules as opportunities to re-litigate issues already ruled upon because the litigant is displeased with the result. *See Sundblad*, 2020 WL 1686237, at *1 (citing *Hutchinson v. Staton*, 994 F.2d 1076, 1082 (4th Cir. 1993)).

The defendant now cites to the defendant's "lack of danger to the safety of any other person or to the community," his good disciplinary record in the B.O.P., family ties, participation in prison programs and work to justify his immediate release even though having only served approximately half[19] of the imposed sentence.  The Court has already considered each of these factors in denying the earlier First Step Act motion.   In denying the First Step Act motion the Court rejected the balancing argument the defendant ***repeats*** here, and concluded:

> To begin, the conspiracy of which Wyatt was a part was a significant one and, during the year that he was a member of it, Wyatt distributed significant quantities of crack cocaine and powder cocaine to distributors who then distributed those controlled, and dangerous, substances within the Richmond area. Further, it appears from the record that Wyatt had been involved extensively in drug dealing for a considerable period of time before he engaged in the crimes of which he was convicted in this case. Those earlier convictions are outlined in paragraphs 35 and 37 of the Presentence Report. Further, the record shows that the offense of conviction occurred after Wyatt had been extended leniency in previous drug distribution convictions.  His conviction record also includes a particularly egregious act of violence described in paragraph 32 of the Presentence Report.
> The record also reflects that, while in prison, Wyatt participated in a goodly number of educational programs and completed his GED. He has filed a re-entry plan and various certificates attesting to the vocational programs in which he has participated successfully while in prison. All of that training (vocational and educational) is indeed a laudable use of his time while in prison, and it reflects a significant effort toward rehabilitation. Additionally, to Wyatt's credit he has received support in the form of letters from individuals who work in the prison system. Those laudable activities do not, however, offset the fact that Wyatt is a rightfully adjudged career offender within the meaning of the law and that his offense conduct in this case is especially egregious. Nor does it offset the fact that he has not learned from previous extensions of leniency for very serious criminal conduct.

---

19  Defendant's Compassionate Release Motion, p.2.

On balance, the record calls for the exercise of discretion in denying the request for modification. The defendant's continued incarceration is necessary to achieve the ends of 18 U.S.C. § 3553(a), especially protection of the public and promotion of respect for the law. So too is the imposed five year term of supervised release.

November 19, 2019 Memorandum Opinion, pp. 4-5. The defendant has not presented anything new or different here that the Court has not already fully considered. And again, the defendant cannot re-litigate issues already ruled upon because the litigant is displeased with the result. *Sundblad*, 2020 WL 1686237, at \*1.

## G. Additional[20] information as directed in the Court's response Order.

Finally, in response to the Court's Order, the United States respectfully provides the following information:

### 1. The Petitioner's currently-projected date of release.

As of May 25, 2020, the defendant has served 51% of his full term. 5/25/20 Inmate Profile. His projected release date is January 13, 2028, presuming good time credits. Full term service release would otherwise be on January 28, 2031.

### 2. Status of the Petitioner's educational and vocational training.

The Court concluded in its earlier denial of the First Step Act motion that:

The record also reflects that, while in prison, Wyatt participated in a goodly number of educational programs and completed his GED. He has filed a re-entry plan and various certificates attesting to the vocational programs in which he has participated successfully while in prison. All of that training (vocational and educational) is indeed a laudable use of his time while in prison, and it reflects a significant effort toward rehabilitation. Additionally, to Wyatt's credit he has received support in the form of letters from individuals who work in the prison system.

---

20 In addition to the defendant's Butner medical file, the United States obtained from the BOP the inmate profile, inmate education data, and disciplinary data current as of May 25, 2020.

November 19, 2019 Memorandum Opinion, pp. 4-5.  There are no additional classes to report. The current education data sheet shows the defendant's last class or program was "circuit training" which ended June 15, 2018.

### 3.  Status of any treatment for substance abuse or physical or mental health.

Treatment on physical health matters is set forth above.  The defendant completed drug education on July 20, 2010.  The defendant is not receiving any further substance abuse or mental health treatment.

### 4.  The Petitioner's post-sentencing conduct, including the Petitioner's compliance with the rules of the institution(s) in which the Petitioner has been incarcerated.

The defendant's disciplinary record is minimal showing only a stealing offense in 2014 (took oatmeal from food service), and in 2017 destroying an item and violating visiting regulations by swallowing an item during a search in the visiting room.

### 5.  Any relevant considerations of public safety.

As set forth above, the United States respectfully submits that the defendant poses a risk to public safety if he were to be released.  This Court has already concluded:

> Rodney Lorenzo Wyatt, Jr. pled guilty to conspiracy to distribute, and possession with intent to distribute, fifty (50) grams or more of cocaine base and 500 grams or more of cocaine hydrochloride in violation of 21 U.S.C. § 846. The record shows that, between October 1, 2008 and continuing through April 1, 2009, the defendant distributed significant amounts of crack cocaine and powder cocaine to drug dealers. Indeed, he acknowledged that, during the time at issue, he purchased for distribution one ounce of cocaine hydrochloride at least ten times; 62 grams of cocaine hydrochloride at least six times; and 125 grams of cocaine hydrochloride at least five times for a total of 1,277 grams of cocaine hydrochloride, much of which was cooked into crack cocaine. Wyatt also acknowledges that, during the conspiracy, he purchased for redistribution one ounce of crack cocaine at least ten times, 62 grams of crack cocaine at least three times, and 125 grams of crack cocaine at least three times for a total of 841 grams of crack cocaine. On September 11, 2009, the defendant was sentenced to 262 months confinement based upon the career offender provision that resulted from two convictions of drug trafficking offenses. ....

[T]he conspiracy of which Wyatt was a part was a significant one and, during the year that he was a member of it, Wyatt distributed significant quantities of crack cocaine and powder cocaine to distributors who then distributed those controlled, and dangerous, substances within the Richmond area. Further, it appears from the record that Wyatt had been involved extensively in drug dealing for a considerable period of time before he engaged in the crimes of which he was convicted in this case. Those earlier convictions are outlined in paragraphs 35 and 37 of the Presentence Report. Further, the record shows that the offense of conviction occurred after Wyatt had been extended leniency in previous drug distribution convictions. His conviction record also includes a particularly egregious act of violence described in paragraph 32 of the Presentence Report.

The record also reflects that, while in prison, Wyatt participated in a goodly number of educational programs and completed his GED. He has filed a re-entry plan and various certificates attesting to the vocational programs in which he has participated successfully while in prison. All of that training (vocational and educational) is indeed a laudable use of his time while in prison, and it reflects a significant effort toward rehabilitation. Additionally, to Wyatt's credit he has received support in the form of letters from individuals who work in the prison system. Those laudable activities do not, however, offset the fact that Wyatt is a rightfully adjudged career offender within the meaning of the law and that his offense conduct in this case is especially egregious. Nor does it offset the fact that he has not learned from previous extensions of leniency for very serious criminal conduct.

On balance, the record calls for the exercise of discretion in denying the request for modification. The defendant's continued incarceration is necessary to achieve the ends of 18 U.S.C. § 3553(a}, especially protection of the public and promotion of respect for the law. So too is the imposed five year term of supervised release.

November 19, 2019 Memorandum Opinion, pp. 2, 4-5. The defendant does not in the pending motion address the Court's prior conclusion. Nothing has occurred to revisit the Court's conclusion.

## Conclusion

For the foregoing reasons the Court should deny the defendants' 603b Motion for Compassionate Release.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:      /s/_____

          S. David Schiller
          Assistant United States Attorney
          V.S.B. 20260
          Office of the United States Attorney
          919 East Main Street, Suite 1900
          Richmond, Virginia 23219
          (804) 819-5400
          (804) 771-2316 (facsimile)
          David.Schiller@usdoj.gov

**Certificate of Service**

I certify that on May 26, 2020, I filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel.

By:     /s/_____

          S. David Schiller
          Assistant United States Attorney