# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>      Plaintiff, )<br>v. )<br>)<br>)<br>RODNEY LORENZO WYATT, JR., )<br>      Defendant )  | Case No. 3:09cr133 |

## REPLY MOTION FOR COMPASSIONATE RELEASE
## PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT

Mr. Wyatt is imprisoned at the site of one of the worst outbreaks of coronavirus in the entire federal prison system: the Butner prison complex. As of June 3, 2020, the Bureau of Prisons ("BOP") announced the deaths of fifteen men at Butner who were infected with the coronavirus. All had serious medical conditions that put them at greater risk; one was 84, one was 81, one was 79, one was 78, one was 74, two were 73, one was 67, two were 63, one was 59, one was 58, one was 57, one was 52, and one was 46. One man was placed on a ventilator for fifteen days before dying on April 11, 2020. A second man spent ten days on a ventilator at a local hospital before dying of respiratory failure. Two men were taken into the hospital when they went into respiratory failure days before the Bureau instituted a 14-day lock-down[1] that began on April 1, 2020, which means that they will have exposed others to the disease.[2] Ten of these men tested positive for COVID-19 after BOP instituted a facility-wide lock-down on April 1, 2020.

---

[1] For detailed description of information provided by the government that makes clear the ineffectiveness of Butner's quarantine and lock-down procedures, *see United States v. Scparta*, 1:18cr578, ECF No. 69 (S.D.N.Y. Apr. 20, 2020) (describing how those in "quarantine" continue to be "housed with many other people in conditions that will inevitably permit the virus to spread" and how quarantine 14-day clock restarts every time "one of the many people" in quarantine tests positive).

[2] BOP issues press releases regarding each death. They may be found at https://www.bop.gov/resources/press_releases.jsp (last visited June 3, 2020). Each press release for the men at Butner who have died indicates that each man, like Mr. Wyatt, had "had long-term, pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease."

This is no idle concern—inmates are catching the virus and dying while these motions are litigated. On April 1, 2020, a district court in Northern Florida commuted a life sentence for the fourth man, Andre Williams, to time-served with 12-months home confinement, finding that his age and medical conditions created a significant risk of "life threatening illness should he be exposed to COVID-19 while incarcerated." *United States v. Williams*, No. 04-cr-95, ECF No. 91 at *7 (N.D. Fla. Apr. 1, 2020). Before the order granting release was filed, Mr. Williams caught coronavirus at the Butner prison complex. He died April 12, 2020, as his family was en route the prison to take him home.[3]

The government has argued, unfortunately baselessly, that there are no cases of coronavirus at the particular section of the Butner complex where Mr. Wyatt is being held: the Federal Medical Center. The Federal Medical Center is a part of the Butner Federal Correctional Complex and has a total of 907 inmates.[4] Mr. Wyatt is at the Federal Medical Center because BOP has classified him as needing the highest level of care that the prison provides: care level four, which BOP defines as "severely impaired."[5] *See* ECF No. 100-1 (indicating that Mr. Wyatt is at care level four). Today, June 3, 2020, as of this morning, five inmates and ten staff have confirmed positive for coronavirus at the Federal Medical Center. An astounding 531 inmates (not counting the fifteen men who have died) and forty-one staff in other parts of the complex have confirmed positive for coronavirus. The seriousness of Mr. Wyatt's medical condition and the significant outbreak of

---

[3] *See* BOP Press Release, *Inmate Death at FCI Butner I*, https://www.bop.gov/resources/news/pdfs/20200413_2_press_release_butner.pdf (last visited June 3, 2020).
[4] *See* BOP, *FMC Butner*, https://www.bop.gov/locations/institutions/buh/ (last visited June 3, 2020).
[5] *See* Corrections Informational Council, *CIC Info Sheet: BOP—Medical Care Levels*, *available at* https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/BOP%20Medical%20Care%20Levels%205.17.17.pdf (last visited May 4, 2020).

COVID-19 at Butner are extraordinary and compelling circumstances that warrant his immediate release.

I. **The Fourth Circuit can authorize a limited remand to this Court to decide the compassionate release motion.**

Federal Rule of Criminal Procedure 37(a)(3) and Federal Rule of Appellate Procedure 12.1(a) provide that the Fourth Circuit may grant a limited remand for the district court to decide a motion for relief that the district court states either that it will grant the motion or that raises a "substantial issue." Numerous courts have granted compassionate relief to federal inmates with underlying health conditions, like those Mr. Wyatt suffers from, that place them at a higher risk for a severe or fatal reaction to COVID-19. *See*, e.g., infra n.18. That some other courts have denied compassionate relief under similar circumstances makes clear that the relief that Mr. Wyatt seeks in his this motion raises a substantial issue, warranting a limited remand for this Court to decide the compassionate release issue in this case. Should the Court indicate that it intends to grant the motion or that the motion raises a substantial issue, Mr. Wyatt will promptly file a motion with the Fourth Circuit Court of Appeals for a limited remand so that this Court can issue a formal ruling on the pending compassionate release motion.

II. **The Court is authorized to grant release now.**

    *a. Congress enacted the provision of the First Step Act authorizing defendants to seek compassionate release from courts precisely because BOP failed to adequately seek compassionate release for worthy individuals.*

Mr. Wyatt administratively requested compassionate release from the warden both on April 1, 2020, and April 17, 2020, and has not heard anything back from the warden since that time[6]. In

---

[6] The government represents that these requests are not found in Butner's files, but that an additional request that Mr. Wyatt made on May 5, 2020, has been received, reviewed, and denied and is simply awaiting the warden's signature. *See* ECF No. 115 at 19. Undersigned counsel is aware that in other cases, clients at Butner have had significant issues with the proper receipt of their compassionate release requests. *See, e.g.*, *United States v. Gallamore*, 3:19cr53, ECF No. 44 at 3 (E.D. Va. May 11, 2020). Even district courts trying

normal times, in most cases, thirty days—fourteen days in the case of terminally ill inmates—would be an adequate compromise between the facility's need to conduct its investigation and an inmate's needs for a prompt determination. Thirty days would give the BOP time to gather medical records and background information about the inmate. Whether it ultimately made a motion or not, the agency's factual record might inform the sentencing court's determination of whether extraordinary and compelling reasons exist.

These, however, are not ordinary times. Under current conditions, staff shortages and conflicting marching orders have left facilities unable to conduct much meaningful process at all during the 30-day period. Though the BOP maintains, publicly, that everything is under control, the pandemic is clearly straining its resources. BOP facilities have been overcrowded and understaffed for years.[7] The current crisis, which has left a significant number of employees sick and a great deal more quarantined, has stretched the agency even thinner. Co-located facilities that used to share staff for economies of scale can no longer do so. Counselors, teachers, and nurses are guarding prisoners.[8] Nurses are working around the clock, and guards "have worked

---

to send direction to BOP have had significant trouble with BOP receiving and processing those directives. *See, e.g.*, *United States v. Guzman*, 1:13cr576, ECF No. 442, at 1 (N.D. Ill. May 28, 2020) (describing that court's "persistent, yet patient" efforts to encourage the BOP to release a prisoner from FCI Elkton, but had no response). Other courts have found that the rationale of the prisoner mailbox rule applies to administrative compassionate relief requests. *See, e.g.*, *United States v. Feucht*, 2020 WL 2781600, at *2 (S.D. Fla. May 28, 2020) (citing cases and finding that because prisoners must rely on prison authorities, over whom they have no control, to deliver the request, the sending of the request is what triggers the 30-day period under 18 U.S.C. § 3582(c)(1)(A)). Thus, while Mr. Wyatt continues to assert that more than thirty days have lapsed since he submitted his request, he replies herein to the government's argument otherwise.

[7] *See Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. 2-4 (2019) (statement of Kathleen Hawk Sawyer, Director, Fed. Bureau of Prisons), https://docs.house.gov/meetings/JU/JU08/20191017/110089/HHRG-116-JU08-Wstate-SawyerK-20191017.pdf.

[8] Joseph Neff and Keri Blakinger, *Federal Prison Agency "Put Staff in Harm's Way" of Coronavirus*, The Marshall Project (Apr. 3, 2020), *available at* https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

shifts as long as 40 hours." *Id.* Correctional officers on shift at hospitals wait to be relieved, but no relief comes.[9] BOP officials have acknowledged these issues. In a sworn declaration, the Associate Warden of Oakdale, the facility with the highest death count, admitted that "[t]he number of sick and quarantined staff has caused a number of non-custody staff to have to work in traditional custody staff roles." *See* Declaration of Associate Warden Segovia, *Livas v. Myers*, 2:20-cv-422-TAD, ECF No. 8-1, at 3-4 (W.D. La. Apr. 10, 2020).

These staff shortages severely curtail the facilities' ability to respond—meaningfully, or at all—to administrative requests. Again, FCI Oakdale's Associate Warden's declaration lays this out starkly. According to the Associate Warden, he was given a list of fifty-eight people to screen for release on home confinement, a form of administrative relief managed wholly by the BOP. *Id.* at 5. In ordinary times, this review would be conducted by case-management specialists. *Id.* But at Oakdale, the leader of the case-management team is out under quarantine, and other case-management staff are performing custody functions. *Id.* at 6. Consequently, the Associate Warden has had to assign "temporary staff" with some experience in case management to the task of reviewing home-confinement applications. With those resources, the facility had managed to review "the vast majority" of home-confinement applications. *Id.* As for compassionate release, the same declaration says that FCI Oakdale has received "a number" of requests since the crisis began and they are "attempting" to process the requests quickly. *Id.* at 4. Tellingly, the Associate Warden points to the changes brought about by the First Step Act that permit an inmate to bypass

---

[9] *See* Janet Reitman, *"Something Is Going to Explode": When Coronavirus Strikes a Prison*, N.Y. Times Magazine (Apr. 18, 2020), available at https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html (last visited Apr. 27, 2020) ("I had an officer that got to work at 6 that morning and volunteered to work at the hospital to relieve a staff member so they could go home. Ended at midnight and never got relieved, drove back to the institution because he had another shift to pull there and fell asleep three times on the highway.").

the BOP and go to the district court, and notes that five inmates have been released because they did so.

Congress authorized defendants to file motions for compassionate release by amending § 3582(c)(1)(A) in the First Step Act precisely because of the BOP's utter failure to do so for over three decades. To appreciate the irony of the government's argument that BOP is better positioned than the Court to decide compassionate release matters, it is imperative to understand the context of Congress's recent decision to allow this Court to grant such motions without BOP's participation. Congress originally enacted the compassionate release provision contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) provides that a district court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).

In its original 1984 enactment, Congress conditioned the reduction of sentences from compassionate release on the BOP Director filing an initial motion in the sentencing court. In other words, prior to the First Step Act, the only way a sentencing court could reduce a sentence was if the BOP Director filed a motion in the sentencing court. *See* Pub. L. No. 98-473 (H.J.R. Res. 648), 98 Stat. 1837 (Oct. 12, 1984). If such a motion was filed, the sentencing court could then decide whether "the reduction was justified by 'extraordinary and compelling reasons' and release was consistent with applicable policy statements issued by the Sentencing Commission." *Id*. The BOP Director, thus, was entrusted with the exclusive authority to decide when a court should consider and grant a request for compassionate release.

This original decision by Congress in 1984 to give the BOP Director exclusive authority over compassionate release effectively made it unavailable. Between 2013 and 2017, BOP

approved just six percent of the 5,400 applications it received. 266 inmates who requested compassionate release died in custody before the sentencing judge was given an opportunity to weigh in.[10] In a key report on the BOP's administration of compassionate release—a report that helped spur the First Step Act's reforms to compassionate release—the Department of Justice's Office of Inspector General ("OIG") explained that the BOP's management of compassionate release prevented many inmates "who may be eligible candidates for release" from even being considered and left "terminally ill inmates dying before their requests were decided." U.S. Dep't of Justice OIG, The Federal Bureau of Prisons' Compassionate Release Program at i (Apr. 2013), *available at* https://oig.justice.gov/reports/2013/e1306.pdf.

To restore compassionate release to its intended role—a mechanism for empowering judges to consider sentencing reductions in appropriate cases—Congress enacted section 603 of the First Step Act. Pub. L. No. 226-391, § 603, 132 Stat. 5194, 5238-40 (2018). The First Step Act loosened the BOP's grip on the pipeline of cases presented to the district court by permitting inmates to petition courts directly. It still gave the BOP a role to play—the BOP would get thirty days in which to investigate a compassionate release request and make an administrative decision or refer the case to the court. *See* 18 U.S.C. § 3582(c)(1)(A) (permitting defendant to bring a motion after "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whoever is earlier[.]"). But the message from Congress to the BOP was clear: triage compassionate release claims quickly, or be cut out of the process entirely. In light of this history, the Court should view with considerable skepticism the

---

[10] *See* Christie Thompson, *Old, Sick and Dying in Shackles*, The Marshall Project (Mar. 7, 2018), *available at* https://www.themarshallproject.org/2018/03/07/old-sick-and-dying-in-shackles.

government's arguments regarding the BOP's expertise and ability to effectively identify which prisoners should be released.

### b. The time prescription rules in 18 U.S.C. § 3582(c)(1)(A) are not jurisdictional.

Section 3582(c)(1)(A) ordinarily requires that a defendant must either (a) fully exhaust administrative rights to appeal the Bureau of Prison's (BOP's) failure to move for compassionate release itself, or (b) wait until 30 days have elapsed from a warden's receipt of the defendant's request for compassionate release before a court may grant a defendant's compassionate release motion. But neither of these alternatives—administrative exhaustion or a 30-day waiting period, whichever occurs sooner—are jurisdictional prerequisites to judicial review of a defendant's compassionate release motion. *See United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017). This point is critical because non-jurisdictional rules may be waived. *See United States v. Taylor,* 778 F.3d 667 (7th Cir. 2015) ("[T]he Supreme Court has taken new care to distinguish between truly (i.e., non-waivable) jurisdictional rules and ordinary case-processing rules.").

"A rule is jurisdictional '[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional.' But if 'Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional.'" *Gonzalez v. Thaler*, 565 U.S. 134, 141-42 (2012) (citations omitted). Put differently, a statutory exhaustion or waiting period requirement is not jurisdictional if the statute "does not contain 'jurisdictional language'—language dictating that judicial review be obtained within a prescribed time and manner before a particular court." *See Stewart v. Iancu*, 912 F.3d 693, 700 (4th Cir. 2019) (discussing 180-day waiting period in Title VII). "Simply because [a] [] waiting period is 'cast in mandatory language' does not render it jurisdictional." *Id.* at 701.

8

The Seventh Circuit in *Taylor* made two observations about § 3582 that bear on whether it imposes jurisdictional requirements. First, "§ 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment." 778 F.3d. at 671. Second, the court emphasized that subsection (c) as a whole is not phrased in jurisdictional terms. *Id.* ("Nor is subsection (c) phrased in jurisdictional terms. It begins: 'The court may not modify a term of imprisonment once it has been imposed,' with exceptions then specified. *Since Congress has not framed the issue in terms of jurisdiction, the statutory indicators point against jurisdictional treatment*.'" *Id.* (emphasis added)). *Stewart* reflects the same line of thinking: Just as the Fourth Circuit concluded with respect to a 180-day waiting period in Title VII, Congress did not include a "clear statement" referencing jurisdiction in § 3582(c)(1)(A) by "explicitly 'tag[ging]' a procedural bar 'as jurisdictional'" in connection with a court's authority to consider a defendant's motion. *See Stewart*, 912 F.3d at 700. As such, § 3582(c)(1)(A) does not impose a jurisdictional prerequisite on this Court.

Furthermore, the text of § 3582(c)(1)(A) and the context in which it was enacted in the First Step Act strongly supports the conclusion that it "incorporate[s] standard administrative law exceptions" to administrative exhaustion requirements. *Cf. Ross v. Blake*, 136 S. Ct. 1850, 1858 n.2 (2016) (noting that statutory exhaustion requirements may incorporate well-settled administrative law exceptions to exhaustion). Indeed, courts have long recognized that a statutory exhaustion requirement that "on its face, contains no exceptions," may in fact permit "exceptions to the exhaustion doctrine." *See, e.g., Washington Ass'n for Television & Children v. F.C.C.*, 712 F.2d 677, 681 (D.C. Cir. 1983).

As an initial matter, "§ 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense." *United States v. Haney*, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020);

9

*United States v. Russo*, No. 16-CR-441, 2020 WL 1862294, at *4 (S.D.N.Y. Apr. 14, 2020) ("The exhaustion requirement in Section 3582(c) is therefore properly understood as a claim-processing rule, which is a non-jurisdictional rule that seeks to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times"; observing that government conceded these points) (internal quotation marks omitted). In particular, "the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court." *Id.*; *cf. Stewart*, 912 F.3d at 699 (noting that Title VII provision at issue was "not a paradigmatic exhaustion requirement").[11] Accordingly, the plain text

---

[11] The government has cited several cases for the proposition that §3582(c)(2) procedural mandates are jurisdictional in nature. *See* ECF No. 33 at 9 n.3. As the Supreme Court has repeatedly recognized, "the word 'jurisdiction' has been used by courts, including this Court, to convey 'many, too many, meanings[.] [W]e have cautioned, in recent decisions, against profligate use of the term." *Union Pacific Ry. Co. v. Bhd. of Locomotive Eng'rs and Trainmen*, 558 U.S. 67, 81 (2009) (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 90 (1998)); *see also Kontrick v. Ryan*, 540 U.S. 443, 454 (2004) ("Courts, including this Court, it is true, have been less than meticulous in this regard; they have more than occasionally used the term 'jurisdictional' to describe emphatic time prescriptions in rules of court."). A jurisdictional bar is one that deprives the court of legal power to hear the case, whether because the court lacks subject matter jurisdiction or personal jurisdiction over a litigant. *See, e.g.*, *Kontrick*, 540 U.S. at 455 ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority."). A claims-processing rule, on the other hand, is a procedural rule that governs timeframes in which to bring cases and other procedural rules. *See, e.g.*, *Arbaugh v. Y. & H. Corp.*, 546 U.S. 500, 510 (2006) ("in recent decisions, we have clarified that time prescriptions, however emphatic, are not properly typed 'jurisdictional.'") (internal quotation marks omitted). Many courts have improperly indicated that a dismissal is based on a lack of jurisdiction, without taking care to determine whether the issue was truly a lack of subject-matter jurisdiction (which would be jurisdictional) rather than a failure to state a claim (which is a procedural claims-processing rule). *Id.* at 511. Such "unrefined dispositions as 'drive-by jurisdictional rulings' [] should be accorded 'no precedential effect' on the question whether the federal court had authority to adjudicate the claim in suit." *Id.* The cases that the government cites in support of its argument that the claims-processing rules in § 3582(c)(2) are jurisdictional in nature, *see* ECF No. 33 at 8 n.3, fall squarely in this category of "drive-by jurisdictional rulings" that should not be adhered to. *See Taylor*, 778 F.3d at 669 (examining thoroughly the difference between § 3582's authorization of subject-matter jurisdiction verses statutory eligibility for relief, and finding that "a district court has subject-matter jurisdiction to consider a motion for relief under 18 U.S.C. § 3582(c)(2) regardless of whether the moving defendant is actually eligible for such discretionary relief"). The Fourth Circuit itself has already decided that § 3582's procedural rules are also not jurisdictional, but

of the statute "allows a defendant to come to court before the agency has rendered a final decision." *Haney*, 2020 WL 1821988, at *3. Congress thus "recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial." *Id.* Furthermore, "Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release." *Id.* The text of the statute thus strongly suggests that the relatively modest procedural hurdle in the statute should not hinder or delay judicial consideration in circumstances that require urgent judicial consideration of a defendant's motion.[12] *Id.*

---

rather act only as procedural constraints on post-judgment sentencing modifications. *See United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017) (citing *Arbaugh*). This Court should not be lulled into making a "drive-by jurisdictional ruling" in this case.

[12] Two cases that the government relies on to argue against the Court waiving the 30-day period warrant further discussion. In *Eberhart v. United States*, 546 U.S. 12, 19 (2005), the Court analyzed Federal Rule of Criminal Procedure 33's claim-processing rule for motions for a new trial. The Court found that that the timeframes set forth in that particular rule "hardly transform[] the Rules into the keys to the kingdom of subject-matter jurisdiction." *Id.* at 17. And while courts "must observe the clear limits of the Rules of Criminal Procedure when they are properly invoked," these limits are not so inflexible that they can never be waived. *Id.* (recognizing that Rule 33 time limits can be waived if opposing party does not properly invoke limits). But, the fact that some of the timeframes in the Federal Rules of Criminal Procedure are "admittedly inflexible" because of the "insistent demand for a definite end to proceedings," *Eberhart*, 546 U.S. at 19, does nothing to support the government's argument that §3582(c)(1)(A)'s waiting period cannot be waived.

Likewise, while the government argues that the Supreme Court in *Ross v. Blake*, 136 S. Ct. 1850 (2016), categorically rejected exceptions to statutory exhaustion requirements, ECF No. 33 at 8, the Supreme Court did no such thing. To the contrary, the Court acknowledged that "an exhaustion provision with a different text an history from § 1997e(a) might be best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions." 136 S. Ct. at 1858 n.2. The Court outlined how the unique history of the Prison Litigation Reform Act of 1995 ("PLRA") aided its analysis in determining that exceptions did not exist for the exhaustion requirement of the PLRA. The precursor of the PLRA, the Civil Rights of Institutionalized Persons Act ("CRIPA"), had a "weak exhaustion provision" that only had to be met by prisoners "if a State provided plain, speedy, and effective" remedies. *Id.* at 1858 (internal quotations removed). Under such a permissive statute, "[t]hat statutory scheme made exhaustion in large part discretionary." *Id.* To stem rising prisoner litigation, Congress drafted the PLRA to create an "invigorated exhaustion provision," one "differing markedly from its predecessor." *Id.* (internal citation and brackets removed). Thus, exhaustion was "no longer left to the discretion of the district court." *Id.* The compassionate relief section of the First Step Act has the opposite history and language of the PLRA. Because BOP utterly failed to use its authority to grant inmates compassionate release for decades, Congress stripped BOP of its sole authority to move the court for a defendant's compassionate release. Rather than creating a necessary exhaustion requirement, Congress removed all true exhaustion

A second unique feature of the so-called "exhaustion" requirement in § 3582(c)(1)(A) is also relevant. Typically, an exhaustion requirement demands that a prospective litigant try to obtain relief from the appropriate administrative agency before she asks a court for that relief. Under such a scheme, "[a] complaining party may be successful in vindicating his rights in the administrative process"; thus, [i]f he is required to pursue his administrative remedies, the courts may never have to intervene." *McKart v. United States*, 395 U.S. 185, 195 (1969).

Here, by contrast, the sentencing court retains at all times the exclusive power to order the defendant's compassionate release. The only question is whether the motion seeking that court order will be filed by the Director of the Bureau of Prisons or by the defendant himself. In either case, the court decides the motion. So, it is not just that the statute allows a defendant to come to court before the agency has rendered a final decision. *See Haney*, 2020 WL 1821988, at *3. It is that—even when the agency reaches a final decision—the parties will, by necessity, end up in court. That judicial consideration of the matter is inevitable under the scheme Congress established in § 3582(c)(1)(A) is another example of Congress's intent that the claims processing-rule in § 3582(c)(1)(A) should not be used to delay a judge's inevitable consideration of an urgent matter.

Moreover, as discussed below, 35 years after compassionate release was originally enacted, Congress amended § 3582(c)(1)(A) in the First Step Act precisely because of the BOP's utter failure to exercise its statutory authority to move for compassionate release. Given this history, §

---

requirements and instituted a simple 30-day waiting period for compassionate release. The new section §3582(c)(1)(A) is thus much more analogous to the permissive CRIPA, where the Court agreed administrative exceptions apply. *See, e.g.*, *Ross*, 136 S. Ct. at 1858 n.2 ("The question in all cases is one of statutory construction, which must be resolved using ordinary interpretive techniques."); *compare United States v. Raia*, 2020 WL 1647922 (3d Cir. Apr. 2, 2020) (noting as an aside, after citing no law and doing no legal analysis at all, that remand to the district court to hear Raia's compassionate release motion would be futile as 30 days had not yet passed) *with Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) ("[e]ven where exhaustion is seemingly mandated by statute . . . the requirement is not [necessarily] absolute.").

3582(c)(1)(A) should be construed to incorporate "standard administrative law exceptions" to exhaustion. In sum, this Court possesses "discretion to waive the exhaustion requirement where, as here, strict enforcement of the 30-day waiting period would not serve these Congressional objectives. And in the extraordinary circumstances now faced by prisoners as a result of the COVID-19 virus and its capacity to spread in swift and deadly fashion, the objective of meaningful and prompt judicial resolution is clearly best served by permitting [Mr. Wyatt] to seek relief before the 30-day period has elapsed." *Haney*, 2020 WL 1821988, at *4. *See also United States v. Casey*, 4:18cr4, ECF No. 35 at 2 (E.D. Va. May 5, 2020) ("The COVID-19 pandemic, which could result in catastrophic health consequences for petitioners vulnerable to infection, implicates all three exceptions justifying the waiver of exhaustion requirement.").

### III. The BOP was unprepared for and slow to react to the spread of coronavirus within BOP facilities.

Nor is the BOP prepared to protect prisoners like Mr. Wyatt, contrary to the government's assertion. The Executive Branch's failure to respond in sufficient time and with adequate preparation to the impending coronavirus pandemic has been well documented. As Dr. Anthony Fauci—the government's leading infectious disease expert—has conceded, the Executive Branch's dilatory approach to the pandemic is responsible to some degree for the number of American deaths that are occurring now.[13] The BOP was not an outlier among amongst Executive branch agencies. Indeed, notwithstanding the government's repeated statements in litigation throughout the country that the coronavirus is not a significant threat to inmates within BOP, the numbers and trajectory of illnesses—and the now 18 inmate deaths—contradict the belief that the

---

[13] Devan Cole, *Fauci admits earlier Covid-19 mitigation efforts would have saved more American lives*, CNN (April 12, 2020), available at https://www.cnn.com /2020/04/12/politics/anthony-fauci-pushback-coronavirus-measures-cnntv/index.html.

BOP is well-prepared and is safe for high-risk individuals like Mr. Wyatt.[14] The data shows the truth[15]:



---

[14] For example, on March 19, 2020, the United States stated: "The risk of [a COVID-19] outbreak is speculative at this time. Currently, there are no reported cases of COVID-19 at any facility operated by the Bureau of Prisons." Govt.'s Opps'n to Def.'s Em. Mot. to Reopen Detention Hearing, *United States v. Grayson*, No. 2:19cr135, ECF No. 40 (W.D. Wash. Mar. 19, 2020) (emphasis added). Not even a month later, on April 15, 2020, the BOP reported 473 inmates and 289 BOP Staff who confirmed positive for COVID-19 and eighteen deaths.

[15] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with* COVID-19 Cases Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).



The realities of confined spaces and staff rotating through the prison simply cannot be fixed in a prison setting. The same is true of nursing homes, which is why the CDC specifically highlights nursing homes as a risk. Nursing homes also follow and exceed the CDC's guidelines concerning sanitation, isolation of the sick, halting visitation by outsiders, and movement by patients within the facility. Yet, nursing homes around the country have seen, and continue to see, violent outbreaks of this virus.[16] This is not because these facilities have not tried to reduce the spread. It is because the individuals inside of them are in close quarters, with rotating staff, and are not capable of proper social distancing.

The staff inside BOP facilities recognize this very real danger. On March 31, 2020, the President of the Council of Prison Locals C-33, which represents more than 30,000 BOP employees, filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging that BOP's responses to coronavirus outbreaks in federal prisons required employees to

---

[16] *The Covid-19 Nursing Home Nightmare* (April 6, 2020) Forbes Magazine, available at https://www.forbes.com/sites/howardgleckman/2020/04/06/the-covid-19-nursing-home nightmare/#2b7a38760acfast visited April 9, 2020).

work in conditions that "are likely to cause death or serious physical harm."[17]  BOP's medical director and OSHA compliance chief ordered staff exposed to the virus, who were in a protective quarantine at home, to report back to work within 48-hours, directly contravening CDC directives to the general public.  *Id.*  The complaint also reported that BOP has moved inmates who were infected or exposed to infection to other facilities around the country and abysmally failed to implement effective social distancing practices within prisons.  *Id.*  The complaint lists 100 of BOP's 122 facilities as non-compliant, including Butner.  *Id.*  The complaint was also filed at a time when only one person had died and only 28 inmates and 24 staff members infected.  *Id.*  Those numbers are now respectively and tragically 18, 473, and 279.

For these reasons, and those already given, this Court should join the many courts that have considered compassionate release motions on their merits notwithstanding the "exhaustion" provision in section 3582(c)(1)(A), in light of the urgent need to get at-risk people out of harm's way before it is too late.[18]

---

[17] *See* https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-danger-spreading-covid-19-union-says/164390/.

[18] *United States v. Kriglstein*, No. 16-cr-663, Dkt. No. 55 (D.N.M. Apr. 23, 2020) (defendant satisfies PS 5050.50(3)(b) released in light of heart & respiratory problems and risk posed by COVID-19); *United States v. Logan*, 1:12-cr-307, DKt. No. 179 (N.D.N.Y. Apr. 22, 2020) (granting compassionate release to 58-year-old with diabetes, hypertension, hypercholesterolemia, and coronary artery disease five years into 148 year term at Fort Dix); *Poulios v. United States*, 2020 WL 192775 (E.D. Va. Apr. 21, 2020); *United States v. Love*, No. 1:14-cr-4, Dkt. No. 41 (W.D. Mich. Apr. 21, 2020) (granting pro se motion for release for armed bank robbery and brandishing a firearm defendant sentenced in 2014 due to history of strokes and risk posed by his incarceration at Elkton); *United States v. Scparta*, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020); *United States v. Atwi*, 2020 WL 1910152 (E.D. Mich. Apr. 20, 2020); *United States v. Gileno*, 2020 WL 1916773 (D. Conn. Apr. 20, 2020); *United States v. Asaro*, 2020 WL 1899221 (E.D.N.Y. Apr. 20, 2020); *United States v. Joling*, 2020 WL 1903280 (D. Or. Apr. 17, 2020); U*nited States v. Atkinson*, 2020 WL 1904585 (D. Nev. Apr. 17, 2020); *United States v. Cosgrove*, Case No. 15-cr-230-RSM, Dkt. No. 95 (W.D. Wash. Apr. 15, 2020) (reconsidering denial of compassionate release and releasing defendant because of "rapid" deterioration of conditions at Terminal Island FCI); *United States v. Kataev*, Case No. 1:16-cr-763-LGS, Dkt. No. 778 (S.D.N.Y. Apr. 14, 2020) (releasing 51-year-old defendant suffering from "chronic sinusitis" and whose wife is disabled such that she cannot care for their 10-year-old child: "Defendant's unique health and family circumstances to gether, and in light of the COVID-19 public health crisis, constitute 'extraordinary and compelling reasons' to modify Defendant's sentence"); *United States v. McPherson*, Case No. 3:94-cr-5708, Dkt. No. 209 (W.D. Wash. Apr. 14, 2020) (releasing defendant

serving astronomical sentence on stacked § 924(c) based on injustice of sentence and risk factors for COVID-19, noting that no "civilized society" could permit continued incarceration under these circumstances); *United States v. Ben-Yhwh*, No. 1:15-cr-830-LEK, Dkt. No. 206 (D. Hawaii Apr. 13, 2020) (excusing the 30-day wait and immediately releasing defendant with asthma and diabetes because his risk factors for COVID-19 present "high probability" of "catastrophic health consequences" if he continues to be detained); *United States v. Tran,* 8:08-cr-197-DOC, Dkt. No. 405 (C.D. Cal. Apr. 10, 2020) (ordering compassionate release in light of BOP's inability to protect vulnerable inmates from COVID-19); *United States v. Smith,* No. 1:12-cr-133-JFK, Dkt. No. 197 (S.D.N.Y. Apr. 13, 2020) (granting release; finding exhaustion waivable and waived); *United States v. Sawicz,* Case No. 08-cr-287, Dkt. No. 66 (E.D.N.Y. Apr. 10, 2020) (releasing child pornography offender based on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension"); *United States v. Trent,* Case No. 16-cr-178, ECF No. 106 (N.D. Cal. Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United States v. Clagett,* Case No. 2:97-cr-265-RSL, Dkt. No. 238 (W.D. Wash. Apr. 9, 2020) (granting stipulated motion for compassionate release in light of severe risks posed by COVID-19); *United States v. Plunk,* Case No. 3:94-cr-36-TMB (D. Alaska Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United States v. McCarthy,* 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (granting compassionate release and waiving exhaustion requirement for defendant at serious risk from COVID-19); *United States v. Hansen,* 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (COVID-19 pandemic and medical problems justifies 7-month reduction in sentence); *United States v. Oreste,* Case No. 1:14-cr-20349-RNS-1, Dkt. No. 200 (S.D. Fla. Apr. 6, 2020) (stipulated compassionate release grant); *United States v. Hakim,* No. 4:05-cr-40025-LLP, Dkt. No. 158 (D.S.D. Apr. 6, 2020) (reducing sentence by an extra 40 months under the First Step Act in light of the extreme danger posed by COVID-19); *United States v. Zukerman,* No. 1:16-cr-194-AT, Dkt. No. 116 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion and granting immediate compassionate release in light of COVID-19 to defendant convicted in multi-million dollar fraud scheme motivated by greed; "The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic"); *United States v. Foster,* No. 1:14-cr-324-02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"); *United States v. Edwards*, No. 6:17-cr-3-NKM, Dkt. No. 134 (Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *United States v. Hernandez*, No. 18-cr-20474, Dkt. No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer & immunosuppression and just under 12 months left to serve on 39 month sentence); *United States v. Perez*, No. 1:17-cr-513-AT, Dkt. No. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271-AB, Dkt. No. 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Williams*, No. 3:04-cr-95-MCR-CJK, Dkt. No. 91 (Apr. 1, 2020) (compassionate release in light of severe risk posed to defendant by COVID-19); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, Dkt. No. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original

**IV. The BOP is not in a better position than the Court to evaluate Mr. Wyatt's request.**

In support of the argument that the Court should not weigh in on Mr. Wyatt's motion at this stage, the government cites several factors that BOP is supposedly in a better position than the Court to assess. ECF No. 115 at 24-26. The list ignores the fact that section 3582 empowers courts to assess factors such as the adequacy of the release plan as a regular course because even the BOP cannot order compassionate release without the Court's approval. The government's brief essentially assumes that the Court can assess these factors only after the BOP has, without explaining why that would be, or why that should be in an emergency. The truth is that the Court, just like the BOP, is equally positioned to assess the sagacity of Mr. Wyatt's release plan.

One member of Mr. Wyatt's family will be able to drive to the prison to pick him up and bring him to his fiancé's house. His fiancé lives with her two children, none of whom are at higher risk for a severe or fatal reaction to COVID-19. She owns a successful real estate business, has space for, and can provide for Mr. Wyatt until he also can start work. Everyone Mr. Wyatt comes

---

sentence."); *United States v. Muniz*, Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting First Step Act relief to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *United States v. Underwood*, Case No. 8:18-cr-201-TDC, Dkt. No. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future").

into contact with can practice social distancing and careful hygiene guidance, including with masks and gloves. The Court is just as able as the BOP to come to the common sense judgment that this is still safer for all involved than leaving Mr. Wyatt trapped with hundreds of other men while the pandemic continues to spread behind prison walls.

The government also suggests that motions such as Mr. Wyatt's layer "on a huge volume of emergency litigation" and are a burden on the BOP. ECF No. 115 at 26. This argument is unfounded: the BOP has not responded to these motions for compassionate release, so they impose no litigation burden on the BOP. And, that one person in danger might be released ahead of other deserving inmates is not an argument to leave him in danger. It is an argument for more motions, not fewer.

**V.     Mr. Wyatt is an appropriate candidate for release.**

The government's extensive arguments about Mr. Wyatt's chronic health conditions are frankly confounding. The evidence indicates that Mr. Wyatt is at a very high risk of having a severe or fatal reaction to COVID-19. He is classified at care level four, which is the most severe level of care that the BOP uses and is only for inmates who are "severely impaired." *See supra* at 2. He has been battling cancer for almost a year. He has continued hypertension despite ongoing treatment. He has a history of heart disease, high cholesterol, and diabetes. Each of these conditions alone is clearly associated with a higher risk for a severe or fatal reaction to COVID-19. *See* ECF No. 113 at 20-21.

He has worked hard in BOP toward his rehabilitation. He has taken vocational training courses, drug programs, and anger management courses. He has a good disciplinary history. He is has received excellent marks from several BOP employees. He has job opportunities upon his release and has a dream to open his own gym for young people to provide them a safe and

inspirational place to create and follow their own dreams.  He has a loving family and incredible community support.  The purpose of compassionate release is to reunite prisoners with their loved ones before it is too late.  While Mr. Wyatt's history includes choices he wishes he could change, that is no reason to keep him in a place where his chances of survival are increasingly lowering.  Six men have died at Butner in just over a week.  Fifteen men have already died—the highest number of COVID-19 deaths in the entire federal prison system.[19]  Mr. Wyatt is asking the Court to let him go home to his family before he becomes number sixteen.

## CONCLUSION

Thus, Mr. Wyatt moves the Court to order his immediate compassionate release and impose the following supervised release conditions: 1) that  Mr. Wyatt abide by the standard supervised release conditions; 2) that within 72 hours of release, Mr. Wyatt contact the U.S. Probation Office by phone for specific reporting instructions; 3) that Mr. Wyatt reside at his fiancé's home and be confined to the home—except when attending medical appointments or other activities approved by the U.S. Probation Office—as long as this Court deems necessary.

Respectfully submitted,
RODNEY LORENZO WYATT, JR.

/s/
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Federal Public Defender Office
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laurakoenig@fd.org

---

[19] *See* Dan Kane, *Butner federal prison begins mass COVID testing after six inmates die in eight days*, June 3, 2020, *available at* https://www.newsobserver.com/news/coronavirus/article243210251.html.